**GLAXO WELLCOME, INC. and Glaxo Group Limited, Plaintiffs,**

v.

**PHARMADYNE CORPORATION, et al., Defendants.**

**No. Civ. AMD 96–455.**

United States District Court, D. Maryland.

Nov. 4, 1998.

---

Stephen B. Judlowe, Brian P. Murphy, Robert G. Gibbons, Regina M. Ambery, Jason A. Lief, Hopgood, Calimafde, Kalil & Judlowe, New York City, John Henry Lewin, Jr., Venable, Baetjer & Howard, Baltimore, MD, for Glaxo Wellcome, Inc.

Howard G. Goldberg, Debbie Beschee, Goldberg, Poke & Beschee, Baltimore, MD, John M. Seeberger, Baltimore, MD, Alan H. Bernstein, Robert S. Silver, Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd., Philadelphia, PA, James Rubin, West New York City, for Pharmadyne Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVIS, District Judge.

I. INTRODUCTION AND PROCEDURAL HISTORY ......................269

II. THE PATENTS ...................................................271
 A. The '431 Patent ...............................................271
 1. Background...............................................271

 2. Subject Matter Jurisdiction Over the '431 Patent ............272
 a. Prior motions for summary judgment as to the '431
 Patent ................................................................272
 b. The renewed motion for summary judgment as to the
 '431 Patent .........................................................273
 B. The '790 Patent ...........................................................273
 1. The significance of pH ..........................................273
 2. The claims of the '790 Patent.................................274
 3. Prosecution History ..............................................275
 C. The '249 Patent ...........................................................277
 1. Introduction .........................................................277
 2. The addition of ethanol achieves surprising results............278
 3. The claims of the '249 Patent.................................279
 4. Prosecution History ..............................................279

III. PHARMADYNE'S DEVELOPMENT OF THE ACCUSED PRODUCT......281
 A. Introduction ................................................................281
 B. The Effort to "Design Around" the Glaxo Patents ..................282

IV. ANALYSIS OF LEGAL CLAIMS AND DEFENSES......................283
 A. Infringement of the '249 Patent.......................................283
 1. Doctrine of Equivalents.........................................283
 2. Application to the facts in the case at bar ..................284
 B. Affirmative Defenses and Declaratory Judgment Issues .............293
 1. Obviousness: The '790 and '249 Patents ....................293
 a. Presumption of Validity ...............................293
 b. '790 Prior Art............................................294
 i. Differences .......................................298
 c. '249 Prior Art............................................300
 i. Differences .......................................301
 d. Secondary Considerations ..............................303
 e. Ordinary Skill in the Art ..............................303
 2. Inequitable Conduct .............................................305
 a. Misconduct in Prosecuting the '431 Patent...............306
 b. Misconduct in Prosecuting the '790 Patent...............307
 i. Buffer Concentration ..............................307
 ii. The Padfield Article..............................308
 iii. The Padfield Declaration .........................309
 c. Misconduct in Prosecuting the '249 Patent...............310
 i. Failure to Disclose the Use of Ethanol in Tagamet ..310
 ii. The Hempenstall Declaration ......................311

V. CONCLUSION ................................................................313

---

Glaxo Wellcome, Inc. and Glaxo Group Limited (together "Glaxo"),[1] instituted this action against Pharmadyne Corporation and several affiliated entities for infringement of patents related to its Zantac medication. Defendants counterclaimed for a declaratory judgment on several grounds. A bench trial commenced on November 12, 1997, and concluded on February 5, 1998. The parties have submitted post-trial briefs, which have been carefully considered. I have carefully considered the entire evidentiary record of the case, and render herein findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

1. Glaxo Group Limited is the parent corporation headquartered in the United Kingdom. Glaxo Wellcome, Inc. is a North Carolina corporation which sells Glaxo Group Limited products in the United States.

## I. INTRODUCTION AND PROCEDURAL HISTORY

Glaxo develops and manufactures ethical pharmaceutical drugs.[2] Over the last decade, Glaxo's premiere product has been the anti-ulcer medication Zantac. Zantac became the largest selling drug in the world and has enjoyed unparalleled commercial success in the pharmaceutical industry.[3] Glaxo's sales of the various forms of its Zantac product have grossed in excess of $100 million annually for several years. In fact, Glaxo's profits from the sale of Zantac medications have been in the billions of dollars and have helped catapult Glaxo into the position of one of the largest pharmaceutical companies in the world.

The active ingredient in Zantac is the aminoalkyl furan derivative ranitidine hydrochloride. Glaxo scientists were the first to synthesize the chemical compound ranitidine. For several years, Glaxo has fought numerous battles in courtrooms all over the country in a largely successful effort to preserve its property in a series of patents expressed in the Zantac mark. *See, e.g., Glaxo Group Ltd. v. TorPharm, Inc.,* 153 F.3d 1366, 1367 (Fed.Cir.1998) ("This is yet another appeal in the ongoing litigation between the holder of patents on a popular medication, Zantac, and a number of generic drug companies who are attempting to sell a generic equivalent of the drug...."); *Glaxo, Inc. v. Novopharm Ltd.,* 110 F.3d 1562 (Fed.Cir.1997); *Glaxo Inc. v. Novopharm Ltd.,* 52 F.3d 1043 (Fed.Cir. 1995).

In 1977, Glaxo's Dr. David Collin synthesized the crystalline-salt form of the ranitidine now used in Glaxo's Zantac drug products. Ranitidine's unique qualities make it a highly marketable drug. Ranitidine is more potent than other anti-ulcer medications on the market.[4] In addition, ranitidine does not cause some of the side effects produced by other anti-ulcer drugs, such as impotence, breast formation in males, and certain endocrine problems.

Glaxo Group Limited holds the three United States patents which are the subject of this litigation—U.S. Patent Nos. 4,521,431 ("the '431 patent"), 4,585,790 ("the '790 patent"), and 5,068,249 ("the '249 patent"). All three patents include ranitidine in a pharmaceutical formulation. In the formulations at issue in this case, Glaxo's ranitidine hydrochloride is dispensed as an oral syrup and injectable product. The syrup formulation is particularly important for children, the elderly and infirm, and adults who are not able to take medication in pill form. Injectable, i.e., intravenous, formulations of Zantac (hereafter "Zantac injection"), covered by the '790 patent, are used particularly for patients who are otherwise receiving intravenous fluids, or those who are unconscious or comatose.

Defendants UDL Laboratories, Inc., Florida, AndaPharma Corporation, and Pharmadyne Corporation are subsidiaries of UDL Laboratories, Inc., Illinois. Defendant UDL Laboratories, Inc. is an Illinois corporation. UDL Laboratories, Inc., Illinois repackages and markets generic pharmaceuticals. Its counterpart in Florida manufactures and packages liquid generic pharmaceuticals. Pharmadyne and AndaPharma were created by UDL for the sole purpose of developing a ranitidine hydrochloride oral solution.[5]

---

2. Ethical pharmaceuticals are prescription-only medications.

3. Zantac's unparalleled success may eventually be overshadowed by the sales record of the "impotence drug," Viagra. Reports indicate that between April and June of this year, 2.9 million Viagra prescriptions were written. Reuters Limited, *Viagra touches off consumer media campaign* (last visited July 9, 1998) <http://www.mediacentral.com/Magazi ... uffstory-bcadvertisingviagra.html>.

4. Ranitidine is similar to other anti-ulcer medications because it is an $H_2$ antagonist and as such lowers gastric acidity.

5. Initially, Glaxo sued Pharmadyne Corporation only. Subsequently, Glaxo moved for leave to amend the complaint to join additional defendants: AndaPharma Corporation, UDL Laboratories, Inc., Illinois, UDL Laboratories, Inc., Florida, and Roderick Corporation. Roderick Corporation, formerly known as TC Manufacturing Company, Inc., was the parent of AndaPharma, Pharmadyne and the UDL corporations.

I granted Glaxo's motion, in part, on grounds that the defendant companies were interrelated and each was involved in the development and potential distribution of a ranitidine hydrochloride syrup. I made the following findings: 1) AndaPharma's primary goal was to develop a liquid form of ranitidine; 2) AndaPharma enlist-

Pharmadyne contracted with UDL to have UDL research, develop, manufacture, test and ultimately distribute Pharmadyne's ranitidine hydrochloride oral syrup in the United States. Pharmadyne also contracted with UDL to act as its agent to prepare an Abbreviated New Drug application ("ANDA") concerning ranitidine hydrochloride oral syrup solely for filing by Pharmadyne with the Food and Drug Administration ("FDA").[6] In November 1995, Pharmadyne submitted its ANDA No. 74–794 seeking approval from the FDA to market ranitidine oral solution USP in the United States, pursuant to 21 U.S.C.A. § 355(j). Pharmadyne's ANDA contained a paragraph IV certification and thus Pharmadyne committed a "highly artificial act of patent infringement" under 35 U.S.C.A. § 271(e)(2).

Under 35 U.S.C.A. § 271(e)(2)(A):

It shall be an act of infringement to submit (A) an application under section 5050 of the Federal Food, Drug, and Cosmetic Act or as described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent, . . . if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug . . . claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.

See generally Eli Lilly and Co. v. Medtronic, Inc., 496 U.S. 661, 676, 110 S.Ct. 2683, 110 L.Ed.2d 605, reh'g denied, 497 U.S. 1047, 111 S.Ct. 11, 111 L.Ed.2d 825 (1990); Glaxo v. Novopharm, Ltd., 110 F.3d 1562, 1568–69 (Fed.Cir.1997), aff'g, 931 F.Supp. 1280 (E.D.N.C.1996).

On December 27, 1995, Pharmadyne notified Glaxo that Pharmadyne was seeking approval from the FDA to market ranitidine oral solution USP in the United States, prior to the expiration of Glaxo's '431 and '790 patents. Pharmadyne stated that both patents were invalid, unenforceable and/or will not be infringed by Pharmadyne's drug product. Subsequently, Glaxo added the '249 patent to the FDA's list of patents in the "Orange Book." Pharmadyne responded by sending Glaxo a supplemental notice of its intent to market its oral solution and assert-

---

ed UDL to assist it in researching and developing a ranitidine pH 6 formulation; 3) AndaPharma assigned its pH 7 formulation to Pharmadyne; 4) Pharmadyne enlisted the aid of UDL in researching and developing the pH 7 formulation; and 5) UDL manufactured 500 liters of both the pH 6 and pH 7 formulations and packaged and tested them. *Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, No. AMD 96–455, slip op. at 5 (D.Md. November 26, 1996). However, I denied Glaxo's motion with regard to the parent corporation, Roderick, on the ground that the evidence did not reflect that "Roderick controlled its subsidiaries 'to the extent that the subservient corporation[s] manifest no separate corporate interest of [their] own and function solely to achieve the purposes of the dominant corporation.'" *Id.* at 8 (citation omitted).

Michael Reicher, President and CEO of UDL, and President of AndaPharma and Pharmadyne, testified at trial that it was necessary to form two separate corporations to develop and distribute a ranitidine oral solution because UDL management was considering selling UDL or taking it public, and that maintaining the confidentiality of the project was crucial to UDL's efforts to attract investors. He also testified that Mylan Laboratories, Inc., the largest generic manufacturer in the United States, purchased UDL in February, 1996. (Reicher Tr. at 2225–27.)

**6.** A pharmaceutical manufacturer seeking approval to manufacture, use and sell a generic version of a patented drug must file an ANDA with the FDA. 21 U.S.C.A. § 355(j). When the patent has not expired, the applicant must certify either "the date on which such patent will expire, or . . . that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted. . . ." 21 U.S.C.A. § 355(j)(2)(A)(vii)(III), (IV). The later certification, which is involved in this case, is commonly known as a "paragraph IV certification."

When a paragraph IV certification is made in an ANDA, the applicant must provide notice to the patentee. 21 U.S.C.A. § 355(j)(2)(B)(i)(I). Such notice "shall include a detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed." 21 U.S.C.A. § 355(j)(2)(B)(ii). FDA approval of the ANDA, in the case of a paragraph IV certification, is stayed for a forty-five day period in which the patentee may initiate an action for patent infringement. 21 U.S.C.A. § 355(j)(5)(B)(iii). "If such an action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(I) or shorter or longer period as the court may order. . . ." *Id.* Certain exceptions apply in the event that the court determines the issue of infringement.

ed that the '249 patent is likewise invalid, unenforceable, and/or will not be infringed.[7]

Upon receipt of Pharmadyne's first notice, Glaxo instituted this action against Pharmadyne for infringement of Glaxo's '790 patent. Pharmadyne answered the complaint and counterclaimed, seeking a declaratory judgment that Glaxo's '790 and '431 patents are invalid, unenforceable, or not infringed. When Glaxo received the second notice, Glaxo filed a second action against Pharmadyne for infringement of its '249 patent. Pharmadyne answered the second complaint and counterclaimed seeking a declaratory judgment that Glaxo's '249 patent is invalid, unenforceable, and/or not infringed. The cases were consolidated for all purposes.

Prior to trial, I entered an order dated July 31, 1997, resolving the infringement issues on the '790 and '431 patents. I granted Glaxo's motion for summary judgment in ruling that Pharmadyne's ANDA product infringes claims 1–5, 9–11 and 13 of the '790 patent. In addition, I entered a summary declaratory judgment that the ANDA product does not and will not infringe the '431 patent, and the making, using, selling, offering for sale, sale or importation of the ANDA product does not and will not infringe the '431 patent. As a result of these interlocutory orders, the only issue remaining for trial related to the infringement issues under the '249 patent and the validity and enforce-

ability issues related to all three patents attacked by Pharmadyne in its various counterclaims and requests for declaratory judgments. As explicated immediately below, I now conclude that the '431 patent is not properly before me.

## II. THE PATENTS

### A. The '431 Patent

#### 1. Background

Glaxo scientists Price, Clitherow and Bradshaw, discovered ranitidine in 1976. In 1977, Glaxo's David Collin made the hydrochloride salt which is covered by Glaxo's now-expired '658 patent.[8] Subsequently, Dr. Crookes, another Glaxo scientist, developed a different crystalline form of ranitidine hydrochloride while preparing batch "3B13" of ranitidine hydrochloride. After analyzing the resulting product, Dr. Crookes discovered that, indeed, he had produced a form of ranitidine hydrochloride that was different from all of the other batches previously produced. Infrared spectroscopy and x-ray powder diffraction analysis of batch "3B13" confirmed Dr. Crookes's observations.[9] Dr. Crookes had invented a polymorph of ranitidine hydrochloride denominated as Form 2.[10] The earlier form of ranitidine hydrochloride covered by the '658 patent was then denominated Form 1. In 1985, Glaxo obtained the '431 patent for Form 2 ranitidine hydro-

**7.** The Secretary of Health and Human Services is responsible for maintaining a list, commonly known as the "Orange Book," of "the official and proprietary name of each [new] drug which has been approved for safety and effectiveness...." 21 U.S.C.A. § 355(j)(7)(A)(i)(I). The list is to be revised every thirty days. 21 U.S.C.A. § 355(j)(7)(A)(ii). Included in this list is the patent information supplied by a drug manufacturer when filing a New Drug Application ("NDA"). 21 U.S.C.A. § 355(j)(7)(A)(iii). In filing an NDA, "[t]he applicant shall file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C.A. § 355(b)(1). If the patent information was unavailable or not required at the time the applicant originally filed its application, it is required

to furnish the information prior to approval of the application or, if already approved, within thirty days of when the patent was issued. 21 U.S.C.A. § 355(b)(1), (c)(2).

**8.** The '658 patent covers what is now known as Form 1 ranitidine hydrochloride.

**9.** Infra-red spectrometers and x-ray powder diffractometers are methods used for characterizing polymorphic materials, i.e., for identifying chemical substances by comparing a measurement (spectrum or pattern) with known characteristic spectra or patterns. These IR spectra or x-ray powder diffraction patterns thus serve as chemical "fingerprints," uniquely identifying the solid chemical substances of interest. (Bernstein Tr. at 251–53.)

**10.** A polymorph is a substance that forms two or more different crystalline structures, for example, diamond and graphite are pure carbon compounds with different crystalline structures.

chloride. The '431 patent covers a chemical compound in a "crystal form of ranitidine . . . hydrochloride, designated Form 2. . . ." (DX–40.) Claim 1 of the '431 patent claims Form 2 ranitidine hydrochloride by its infrared spectrum, and lists the main peaks of the infrared spectrum of Form 2. Claim 2 is dependent upon Claim 1, and characterizes Form 2 by its x-ray powder diffraction pattern and lists the characteristic "d" spacings and relative intensities of Form 2. The '431 patent expires in 2002.

### 2. Subject Matter Jurisdiction Over the '431 Patent

■ Twice prior to trial and then again during trial, Glaxo moved for summary judgment seeking to dismiss the '431 patent from the lawsuit on the ground that the court lacked subject matter jurisdiction. Glaxo asserted that the court lacked subject matter jurisdiction primarily on the basis that Glaxo had not sued Pharmadyne for infringement of the '431 patent. In fact, Pharmadyne introduced the '431 patent into the case when it sought a declaratory judgment under its counterclaim that the '431 patent is invalid and/or not infringed and under its counterclaim that under collateral estoppel or laches principles, Glaxo should be eternally barred from suing Pharmadyne for infringement of the '431 patent.

### a. Prior motions for summary judgment as to the '431 Patent

Glaxo first moved for partial summary judgment for lack of subject matter jurisdiction over the '431 patent on May 24, 1996. Glaxo contended that there was no controversy surrounding the '431 patent because Glaxo had not alleged infringement and Pharmadyne claimed that its ANDA product did not infringe the patent. I denied Glaxo's motion for partial summary judgment on the ground that at that time there was a controversy surrounding the '431 patent. Pharmadyne had a reasonable apprehension that Glaxo would sue it for infringement of the '431 patent. At that time, the evidence

before the court reflected that the bulk active ingredient Pharmadyne was using in the manufacture of its product was ranitidine hydrochloride and might possibly fall into the category of Form 2 ranitidine hydrochloride covered by the '431 patent. Furthermore, there was evidence indicating that Glaxo would initiate suit against Pharmadyne for infringement of the '431 patent if Glaxo determined that Pharmadyne was using Form 2 ranitidine hydrochloride in its ANDA product. Glaxo had publicly stated its policy to use patent infringement litigation to prevent generic competitors from marketing ranitidine products, particularly products using Form 2. Additionally, there was evidence demonstrating that Glaxo had actually pursued litigation in this area. Moreover, Glaxo made statements—pregnant with ominousness—that it had no basis for determining whether Pharmadyne was infringing the '431 patent.

In April 1997, after some discovery and further factual development of the case, Pharmadyne moved for summary judgment that its ANDA product would not infringe the '431 patent. At a hearing held on July 29, 1997, Glaxo conceded non-infringement. Glaxo cross-moved for summary judgment as to the '431 patent, however, once again, on the ground that the Court lacked subject matter jurisdiction. Glaxo sought to remove the issues of invalidity and unenforceability of the '431 patent from the case.[11] Glaxo argued that dismissal of Pharmadyne's counterclaim seeking declaratory relief was warranted because Pharmadyne's concession that its ANDA product as formulated at that time did not infringe the '431 patent resolved any controversy over the '431 patent. Ultimately, I found that there were disputes of material fact with "respect to whether or not there was a case or controversy between the parties on the '431 patent." (Trans. 7/29/97 at 7–8.) Accordingly, I granted summary judgment of non-infringement of the '431 patent to Pharmadyne, but denied without prejudice Glaxo's cross-motion with respect to subject matter jurisdiction.

11. Glaxo also moved for summary judgment that the '790 patent was infringed. Pharmadyne conceded that the accused product infringed the '790 patent. Accordingly, I granted summary judgment in favor of Glaxo as to infringement of the '790 patent.

b. The renewed motion for summary judgment as to the '431 Patent

Once the trial commenced in November 1997, it became apparent that the court lacked subject matter jurisdiction over the '431 patent. It was evident that Pharmadyne no longer had reason to fear that it would be held liable for practicing the invention claimed in the '431 patent. At trial, the reality was that Pharmadyne's fear and apprehension of a lawsuit were centered on highly contingent future, not present, activity. Pharmadyne, however, desired to continue litigating issues related to the '431 patent because it feared that Glaxo would sue it at some future time if it decided to use Form 2 ranitidine. Pharmadyne also was concerned that Glaxo would institute actions against its suppliers resulting in Pharmadyne being left without a supplier for Form 1 ranitidine hydrochloride.

When Glaxo renewed its motion at trial, I held that Pharmadyne's desire to use Form 2 at some uncertain future date, and its fear that litigation by Glaxo would make it difficult to obtain Form 1 ranitidine from its suppliers, was not enough to confer jurisdiction on the court to decide the validity and/or enforceability of the '431 patent.[12] *See Super Sack Mfg. Corp. v. Chase Packaging Corp.,* 57 F.3d 1054, 1058 (Fed.Cir.1995) (Jurisdiction over a declaratory judgment action requires that "[t]here must be both (1) an explicit threat or other action by the patentee, which creates a *reasonable* apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) *present* activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.") (emphasis in original) (citation omitted), *cert. denied,* 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 760 (1996); *Spectronics Corp. v. H.B. Fuller Co., Inc.,* 940 F.2d 631, 635 (Fed.Cir.) (noting that a party seeking a declaratory judgment pursuant to 28 U.S.C.A. §§ 2201, 2202 must establish that subject matter jurisdiction over its action existed at the commencement of the action, and continues after the complaint is

filed), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991); *see also Super Sack;* 57 F.3d at 1058 ("[T]he 'actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.' ") (*quoting Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975)); *but see Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1988) (test for evaluating whether court has subject matter jurisdiction in a declaratory judgment action is applied to the facts existing at the time the complaint was filed). For these reasons, Glaxo's renewed motion for summary judgment is granted as to the '431 patent and any and all claims related thereto are dismissed without prejudice for lack of subject matter jurisdiction.

B. The '790 Patent

1. The significance of pH

In the late 1970's and early 1980's, Glaxo scientists experimented with different pharmaceutical formulations of ranitidine, including a simple injection solution. The first injection solutions, at concentrations of 2 mg/ml and then 10 mg/ml, were adjusted to a pH of 5.0. Through further experimentation, Glaxo scientists concluded that a ranitidine injection solution was most stable between pH 5–5.5, which they termed its "natural pH." Glaxo produced a ranitidine injection solution with a "natural pH" in the United Kingdom, and it was first sold there beginning in October 1981.

In an effort to develop an intramuscular ranitidine injection solution containing a higher concentration of ranitidine hydrochloride (25 mg/ml) and with an adequate shelf-life, i.e., a product suitable for storage conditions in the U.S. market, Glaxo's Drs. Padfield and Winterborn conducted an investigation of the effect of a variety of factors, including pH, on the stability of solutions of ranitidine hydrochloride. Drs. Padfield and Winterborn concluded that the shelf-life of aqueous based formulations containing ranitidine and/or ranitidine hydrochloride was significantly improved if the pH of the formula-

---

**12.** At trial, I allowed Pharmadyne to present evidence on the '431 patent regarding inequitable conduct before the Patent Office on its unen-

forceability claims as to the '790 and '249 patents. (Tr. at 4637–44.)

tion is increased from the "natural pH" to a pH in the range of 6.5–7.5. Accordingly, the '790 patent claims an improved formulation of ranitidine and/or its physiologically acceptable salts, including ranitidine hydrochloride. The invention claimed is that the higher pH range significantly increases the shelf-life of an aqueous ranitidine hydrochloride solution as compared to the shelf-life of the product at its "natural pH" of 5.5.

Although Glaxo filed its U.S. patent application on May 11, 1984, it claimed the benefit of the earlier filing date of May 13, 1983, for its corresponding British patent application. The '790 patent issued on April 29, 1986, but only after extensive evaluation by the patent examiner, rejection of the patent application, and reconsideration of the application as discussed below.

### 2. The claims of the '790 Patent

The claims of the '790 patent are as follows:

*Claim 1*

A pharmaceutical composition which is an aqueous formulation containing an effective amount of ranitidine and/or one or more physiologically acceptable salts thereof for treatment of conditions mediated through histamine $H_2$ receptors, said formulation having a pH within the range of 6.5–7.5.

*Claim 2*

A pharmaceutical composition according to claim 1 having a pH in the range 6.7 to 7.3.

*Claim 3*

A pharmaceutical composition according to claim 1 having a pH in the range 6.8 to 7.1.

*Claim 4*

A pharmaceutical composition according to claim 1 in which said pH is adjusted by means of suitable buffer salts.

*Claim 5*

A pharmaceutical composition according to claim 4 in which said buffer salts are potassium dihydrogen orthophosphate and disodium hydrogen orthophosphate or citric acid and disodium hydrogen orthophosphate.

*Claim 6*

A pharmaceutical composition according to claim 1 in a form suitable for parenteral administration.

*Claim 7*

A pharmaceutical composition according to claim 6 in a form suitable for injection and containing 10 to 100 mg/ml ranitidine, expressed as free base.

*Claim 8*

A pharmaceutical composition according to claim 6 in a form suitable for continuous infusion and containing 0.1–2.0 mg/ml ranitidine, expressed as free base.

*Claim 9*

A pharmaceutical composition according to claim 1 in a form suitable for oral administration.

*Claim 10*

A pharmaceutical composition according to claim 9 containing 20–400 mg per 10 ml dose.

*Claim 11*

A pharmaceutical composition according to claim 1 containing ranitidine in the form of its hydrochloride salt.

*Claim 12*

A process for the production of a composition of claim 1 suitable for parenteral administration, which comprises dissolving ranitidine and/or one or more physiologically acceptable salts thereof and said remaining constituents in water suitable for injection, followed by sterili[z]ation.

*Claim 13*

A process for the production of a composition of claim 1 suitable for oral administration which comprises adding an aqueous

solution of ranitidine and/or one or more physiologically acceptable salts thereof to an aqueous solution or dispersion of a viscosity enhancing agent.[13]

(PX–1, column 4.)

### 3. Prosecution History

The file wrapper for the '790 patent discloses Glaxo's '658 patent and the so-called "Padfield Article" and explains the content and relevance of the two prior art references as:

> Ranitidine ... and physiologically acceptable salts are described in British Patent Specification No. 1565966. In that specification there is reference to liquid formulations for oral and parenteral administrations and there is a description of an aqueous based formulation for intravenous administration and another of an oral syrup. Both of these formulations contain sufficient hydrochloric acid to achieve a pH of 5.0. In addition injection formulations are described by Padfield et al (The Chemical Use of Ranitidine, Medicine Publishing Foundation Symposium Series 5, Oxford:Medicine Publishing Formulation 1982 pp. 18–22) in the form of a simple aqueous solution of ranitidine hydrochloride at its natural pH, i.e. about 5.5. Whilst such formulations containing ranitidine and/or its physiologically acceptable salts are therapeutically effective they suffer from the disadvantage of having a relatively short shelf life due to the breakdown of the ranitidine.[14]

(PX–2.)

The claims of the '790 patent application were rejected initially by the patent examiner on July 2, 1984. The examiner stated:

> Claims 1–11 are rejected under 35 U.S.C.A. 103 as being unpatentable over Chem.Abst. all.
> The art appreciates pharmaceutical formulation of Ranitidine. The compositions are considered as *prima facie* obvious, the pH range notwithstanding. Said range is within the skill of the art, i.e. neutral, and

has not been demonstrated as being critical.

(PX–2, p. 26.)

Claims 12–14 were rejected as "too broad in not reciting all parameters of production" and for "being indefinite for failing to particularly point out and distinctly claim the subject matter which the applicant regards as the invention ... [a] process which comprises processing is vague and indefinite processing fails to define what is done." (PX–2, p. 25.)

In response, Glaxo filed an amendment to claim 1 in early November 1984 and informed the patent examiner that the prior art does not disclose aqueous based formulations of ranitidine having a pH in the range of 6.5 – 7.5. Glaxo specifically noted that the prior art also did not disclose that the higher pH range would have produced significantly enhanced stability, which improved the shelf-life of the formulation. Glaxo remarked:

> There is absolutely no suggestion in the prior art of record of aqueous based formulations of ranitidine having a pH in the range of 6.5–7.5 let alone a disclosure that an aqueous based formulation of ranitidine having a pH in this range would have the advantage over the formulation described in the prior art of significantly enhanced stability leading to improved shelf life. . . .
>
> Thus, for example, in the case of a 25 mg/ml ranitidine hydrochloride injection solution buffered to the appropriate pH with phosphate salts and subjected to a storage of 20˜C, the rate of breakdown of ranitidine *is about 10 times faster* for a solution buffered to pH 5.5 than for a solution buffered to pH 7.0. . . .

Assuming, on the basis of the Chemical Abstracts reference, that one of ordinary skill in the art wishes to produce an aqueous formulation of ranitidine, the skilled person would consider the most relevant art, the prior art discussed above and this would lead him to produce an aqueous formulation with

---

**13.** Initially, the patent application contained 14 claims. The original claim 12 was scratched thereby resulting in only 13 claims being finally approved.

**14.** British Patent Specification No. 1,565,966 corresponds to U.S. Patent 4,128,658 ("the '658 patent"). (PX–2, p. 32.)

a pH of around 5 to 5.5 ... This is particularly true in view of the teaching in the Padfield et al. Paper which states that the injection was most stable at its natural pH which as already noted, is around 5.5.

While there is no doubt that one of ordinary skill in the art would be able to adjust the pH of an aqueous based ranitidine formulation to a pH within the range claimed in the present application, there is nothing to suggest any reason or motivation for one of ordinary skill in the art to do this ....

(PX–2, pp. 33–34) (emphasis in original.)

Subsequently, the examiner issued a rejection of the patent claims, again raising the question of obviousness. (*Id.* at 36–37.) On February 21, 1985, Glaxo's attorney had a personal interview with the examiner to discuss the claims and prior art, including the '658 patent and the Padfield article. (*Id.* at 39.) As a result of the interview, the examiner agreed to approve the application if a "side-by-side comparison of Glaxo's formulations showed unexpected results for pH." (*Id.*)

In September 1985, Glaxo submitted a Request for Reconsideration. (*Id.* at 43.) The sworn declaration of Dr. John Padfield (the "Padfield Declaration") accompanied the request and contains a "side-by-side" comparison of accelerated stability studies performed on two 25 mg/ml ranitidine hydrochloride injection solutions, one buffered to pH 5.5 and one buffered to pH 7.0. (*Id.* at 48–57.) In relevant part, the "Padfield Declaration" states, as follows:

9. I would not dispute that the art teaches aqueous based formulations of ranitidine and its physiological acceptable salts

at pH 5.0–5.5. Nor would I dispute that it is within the skill of the art to adjust the pH to the range that we claim in the present application. However, there is no teaching that it would be advantageous to adjust the pH to 6.5–7.5; indeed the art clearly leads one away from doing so in that it teaches that aqueous solutions of ranitidine hydrochloride are most stable at a pH of around 5.5.

\* \* \* \* \* \*

15. Thus, on the basis of the above calculations a significant increase in shelf life can be achieved if one adjusts the pH of a 25 mg/ml ranitidine injection at normal storage temperatures from 5.5. to 7.0. Long term (three year) stability studies on 25 mg/ml ranitidine injections at pH 6 and 7 and at 20Č and 30Č have confirmed these predictions of an extended shelf life at pH 7.

16. In my opinion, it was not obvious from the teachings of the art to adjust the pH of aqueous based formulations of ranitidine and/or one or more of its physiologically acceptable salts to within the range of 6.5–7.5 and it is surprising that the shelf life is significantly enhanced, as demonstrated above, by adjusting the pH in this manner.

(*Id.* at 52, 56.)

The following data is contained in the declaration:

Table 1. The Ranitidine Content of Ranitidine Injection (25mg/ml) expressed as a Percentage of the initial value in formulation at pH 5.5 and pH 7.0

| Day of Test | pH 5.5 | | pH 7.0 | |
|---|---|---|---|---|
| | 70°C | 80°C | 70°C | 80°C |
| 0 | 100.00 | 100.00 | 100.00 | 100.00 |
| 1 | 98.53 | 95.22 | 99.76 | 96.63 |
| 4 | 93.03 | 83.02 | 97.35 | 92.00 |
| 6 | - | 76.21 | - | 87.96 |
| 8 | 86.77 | 65.17 | 94.46 | 84.16 |
| 11 | 83.10 | 64.49 | 92.48 | 76.51 |
| 14 | - | 57.87 | - | 73.19 |
| 15 | 78.76 | - | 90.34 | - |

Based on the accelerated temperature studies represented in Table 1, Padfield concluded in the declaration:

> As demonstration of the improved stability of aqueous based formulations at the higher pH, we have calculated that, at 20C̃, the rate of breakdown of the ranitidine is about ten times faster for a solution at pH 5.5 than for a solution at pH 7.0.

(*Id.* at 52–53.) Dr. Padfield indicated that the 20C̃ and 25C̃ rate constants for 5% loss of ranitidine hydrochloride were calculated using the Arrhenius equation on the rate constant data from Table 1. (*Id.* at 55.)[15] These results were tabulated in Table 4 of the declaration:

Table 4. Time for 5% Loss Ranitidine to Occur in a 25 mg/ml Ranitidine Injection at pH 5.5 and 7.0 at 20C̃ and 25C̃

| Storage Temperature | pH 5.5 | PH 7.0 |
|---|---|---|
| 20° | 23.7 months | 276 months |
| 25° | 12.7 months | 122.8 months |

On September 27, 1985, the examiner issued an Advisory Action indicating that claims 13 and 14 would be allowable. Although he acknowledged the "unexpectedness" of the results, the examiner still rejected claims 1–11. He reasoned that Dr. Padfield's remarks in the declaration "it is within the skill of the art to adjust the pH to the range that we claim in the present application," indicated that "any benefits would logically flow and are inherent." (*Id.* at 58–59.) In October 1985, Glaxo filed a response to the Advisory Action pointing out that the examiner had misconstrued the "Padfield Declaration" and emphasizing that the prior art did not teach or suggest any advantage in adjusting the pH of ranitidine solutions to the range of 6.5–7.5. (*Id.* at 61–63.) Glaxo asserted that "[t]he test of obviousness is not 'obvious to try' various pH ranges, but the obviousness of the invention in its entire-

ty." (*Id.* at 63.) Following Glaxo's last communication, the examiner, on December 6, 1985, allowed claims 1–11 and 13–14. (*Id.* at 65–70.)

### C. The '249 Patent

#### 1. Introduction

In the early 1980's, Glaxo began development of an aqueous ranitidine hydrochloride oral syrup product for commercial release, i.e., Zantac syrup. The original formulation was based on the Zantac injectable product covered by the '790 patent. (Long Tr. at 277–79.) In November 1983, Glaxo submitted to the FDA a "Notice of Claimed Investigational Exemption for a New Drug for Zantac (ranitidine hydrochloride) Syrup." (PX–63; Long Tr. at 276.) As described in the application, the original formulation for Zantac syrup included a preservative system composed of three parabens: methylparaben, propylparaben and butylparaben, but it did not contain any alcohol. The original syrup formulation met the requirements of the Antimicrobial Preservative Effectiveness test of the United States Pharmacopeia (USP).[16] As work progressed on the syrup formulation, it however, became apparent that the formulation was prone to contamination with a microbial known as *pseudomonas cepacia.* Dr. David Long, a research scientist at Glaxo in the United Kingdom, discovered the contamination problem. Ultimately, through analysis and experimentation, he discovered that adding ethanol to the formulation killed the *pseudomonas cepacia.* Interestingly, as well, as he testified at trial, it was surprising to discover that the addition of ethanol also increased the stability of the ranitidine hydrochloride in the syrup formulation without requiring a change in the preferred pH of 6.5–7.5 of the base formula. (Long Tr. at 425.) It is the claim of the patent for this "improved" syrup formulation that Glaxo as-

---

**15.** The Arrhenius equation is a tool utilized by scientists wherein accelerated, i.e., elevated temperature studies over short time intervals, predict performance at room temperature.

**16.** The United States Pharmacopeia publishes monographs of approved drug substances.

278

serts is infringed by the ANDA 74–794 product that Pharmadyne proposes to manufacture and distribute for sale.

### 2. The addition of ethanol achieves surprising results

In 1985, Dr. Long was conducting in-use testing on the original syrup formulation when he discovered that it was contaminated with the microbial *pseudomonas cepacia.* (Long Tr. at 280–81.) He had noticed that there was a decrease in the concentration of one of the parabens. Dr. Long considered this decrease a surprise because there was data from a study of the formulation in sealed bottles showing that there was little change in the product over a two year period. (Long Tr. at 280.) Additionally, the degradation of the paraben concentration did not fit any known law of degradation of parabens. (Long Tr. at 281.) Dr. Long had the product analyzed by Glaxo microbiologists who discovered that it contained *pseudomonas cepacia.* (Long Tr. at 281.)

At the time of this discovery, Glaxo had submitted a product license application to the regulatory authorities in the United Kingdom, and Dr. Long was in the process of transferring the process of manufacture of the syrup formulation to the Glaxo factory in Liverpool. (Long Tr. at 280–81.) Dr. Long testified that the project came to a "screeching halt" when he discovered the contamination problem. (Long Tr. at 280.) Glaxo delayed the development of the syrup formulation in order to further investigate the microbial contamination problem.

To combat the contamination problem, Dr. Long devised a strategy that included the exploration of the use of ethanol, chlorhexidine, phenoxyethanol, benzalkonium chloride, and propylene glycol. He also considered requiring that the product be refrigerated or packaged in single dose creamer packs.

Dr. Long finally decided to use ethanol because it is a known and effective preservative for aqueous pharmaceutical products. He testified that he felt comfortable using ethanol because it was contained in a similar product on the market, Tagamet. In early October 1985, Dr. Long tested the effects of a little less than 1%, 3% and a little over 5%

ethanol on the formulation. Because 5% ethanol was successful in killing the *pseudomonas cepacia,* Dr. Long decided to use 7.5% ethanol (weight/volume) to ensure that a minimum of 5% ethanol (weight/volume) would remain in the product throughout its assigned shelf-life. (Long Tr. at 421–22.)

Glaxo's modified formulation containing 7.5% ethanol met the USP's Antimicrobial Preservative Effectiveness test and was effectively preserved against *pseudomonas cepacia.* As finally constituted, Glaxo's ethanol syrup formulation contains the following ingredients:

1. Ranitidine hydrochloride
2. Hydroxypropyl Methylcellulose 2906 or 2910 USP (viscosity type 4000cp)
3. Alcohol USP
4. Propylparaben NF
5. Butylparaben NF
6. Monobasic Potassium Phosphate NF
7. Dibasic Sodium Phosphate (dried) USP
8. Sodium Chloride USP
9. Saccharin Sodium USP
10. Sorbitol Solution USP
11. Mint Flavour IFF 17:42:3632
12. Purified Water USP

(PX–64, p. Y060572; Long Tr. at 285.)

Between April and October 1986, the 7.5% ethanol formulation was placed on stability review to determine whether the formulation was chemically stable throughout the assigned shelf-life as necessary for regulatory approval. (PX–238, p. Y084402; PX–116.)

In December 1986, Glaxo submitted an amended NDA for the syrup reflecting the new formulation containing ethanol. (Long Tr. at 286.) Using the 6 month stability data on the product containing ethanol in combination with the 12 month stability study data on the syrup without ethanol, Glaxo proposed an 18 month shelf-life for the new syrup formulation at storage temperatures between 2–30C̃. (Long Tr. at 286–87.)

In the stability studies submitted with the NDA in December 1986, Glaxo concluded as follows:

> Our assignment of the shelf-life for Zantac syrup is based on the acceptance of up to a

5% loss of ranitidine on storage. The supporting stability data for the formulation without ethanol, ..., allow a predicted shelf-life of eighteen months when stored at 2–30 degrees centigrade for that formulation. A comparison of the results for Zantac Syrup with ethanol ... and ranitidine syrup without ethanol ... shows that the addition of ethanol does not adversely affect the stability of. ranitidine. Consequently, the shelf-life predicted for the formulation with ethanol should be similar to that of the formulation without ethanol.

(PX–64, p. Y060620.)

Ultimately, Dr. Long inadvertently discovered the significant enhancing effect of ethanol on the stability of ranitidine hydrochloride while evaluating comparative ·stability data of the nonethanol formulations with the ethanol formulations in preparation for filing the NDA. Indeed, this was a surprise to Dr. Long. At most, Dr. Long had hoped that the addition of ethanol would cure the contamination problem without altering the stability of the formulation. (Long Tr. at 425–26.)

3. The claims of the '249 Patent

The claims of the '249 patent are as follows:

*Claim 1*

A pharmaceutical composition which is an aqueous formulation for oral administration of an effective amount of ranitidine and/or one or more physiologically acceptable salts thereof, said formulation comprising a stabilizing effective amount of ethanol and said composition having a pH in the range of 6.5–7.5.

*Claim 4*

A pharmaceutical composition according to claim 1 having a pH in the range 6.8 to 7.4.

*Claim 5*

A pharmaceutical composition according to claim 1 having a pH in the range of 7.0 to 7.3.

*Claim 6*

A pharmaceutical composition according to claim 1 wherein said pH is obtained by the use of buffer salts.

*Claim 7*

A pharmaceutical composition according to claim 1 prepared using ranitidine in the form of the hydrochloride salt.

*Claim 8*

A pharmaceutical composition as claimed in claim 1, wherein the effective amount is 20–400 mg ranitidine per 10 ml dose expressed as free base.

*Claim 9*

A pharmaceutical composition as claimed in claim 1 wherein the effective amount is 20–200 mg ranitidine per 10 ml dose expressed as free base.

*Claim 10*

A pharmaceutical composition as claimed in claim 1, wherein the effective amount is 150 mg ranitidine per 10 ml dose expressed as free base.

(PX–3.) The specification of the '249 patent states:

We have now surprisingly found that the stability of ranitidine in aqueous based formulations and more particularly aqueous based formulations for oral administration may be substantially enhanced by the addition of ethanol to the formulation.

4. Prosecution History

On December 12, 1986, Glaxo filed British Patent Application No. 86 29781. Glaxo filed its corresponding United States patent application Serial No. 07/131,422 on December 11, 1987 in the name of the inventor David R. Long. Two continuation applications were filed as discussed below.

An information disclosure statement was filed in the initial patent application referencing Glaxo's '658 and '790 patents, and two Chemical Abstract references, 97,61014G

(1982) and 104,102280Z (1986). (Stipulation 70.) Although Glaxo informed the FDA that ethanol was added to its formulation to kill *pseudomonas cepacia,* Glaxo never told the PTO why ethanol was added.

On May 5, 1988, the patent examiner rejected all of the originally-filed claims, as indefinite and non-enabling under 35 U.S.C.A. § 112 and as obvious under 35 U.S.C.A. § 103 over both Chemical Abstract references. The examiner reasoned that the Chemical Abstracts taught the cojoining of ranitidine and alcohol (e.g., ethanol) and that he did not find the additional pH limitations to be patentable. (Stipulation 71.) On November 7, 1988, Glaxo filed an amendment to Claim 1 to particularize that the formulation would include a "stabilizing effective amount" of ethanol. (Stipulation 72.) Following this submission, the examiner issued a final rejection of the patent claims, again raising the question of obviousness under 35 U.S.C.A. § 103. (Stipulation 73.)

On April 27, 1989, Glaxo filed a continuation application serial no. 07/344,620, abandoning the '422 application. (Stipulation 74.) In an Office Action dated June 6, 1989, the examiner again rejected the claims as being obvious under 35 U.S.C.A. § 103 and stated that:

> The art teaches the cojoined use of ranitidine and an alcohol (ethanol). The claims also teach ranitidine and ethanol. The various parameters of the claims; i.e. pH and amounts, are considered as choices to one skilled in the art. Such parameters have not been demonstrated as being critical and as such are to be considered to be within the skill in the art.

(Stipulation 75.) To counter this rejection, Glaxo filed an additional amendment and advised the examiner that:

> [T]he art does not teach the cojoining of ranitidine and an alcohol in a pharmaceutical composition which is an aqueous formulation for oral administration. These references do not lead one of ordinary skill in the art [in] any way to expect that the stability could be enhanced by the presence of ethanol and does not suggest the presence of ethanol in such compositions. (Stipulation 76.)

Once again, Glaxo received a rejection of the claims as being obvious under 35 U.S.C.A. § 103, based on the Chemical Abstracts. Glaxo filed another continuation application on March 4, 1990. On May 4, 1990, Glaxo was faced with the same rejection. The examiner stated that the art teaches cojoined use of ranitidine and an alcohol (ethanol). (Stipulation 79.) On October 31, 1990, Glaxo filed yet another amendment and advised the examiner that a declaration was being prepared. (Stipulation 80.) Some claims were allowed based on the amendment. However, new rejections were issued based upon additional documents filed by Glaxo on January 10, 1991. (Stipulation 81.) On May 10, 1991, Glaxo filed a "Request for Reconsideration" and in support of the application filed the declaration of Dr. John Hempenstall (the "Hempenstall Declaration"). (Stipulation 82.) Glaxo advised the patent examiner:

> Applicant acknowledges that ethanol has previously been used in pharmaceutical compositions. However, the purpose for which ethanol has been included has been either as a solvent or as a preservative against bacterial contamination. There was, however, no reason to suppose that either of these functions of ethanol would have had any beneficial effects in terms of limiting the degradation of ranitidine and aqueous formulations thereof. For this reason, there would have been no skill in the art to include ethanol in an aqueous ranitidine formulation. Ranitidine is very soluble in water and ethanol is quite unnecessary to assist in the dissolution of ranitidine in the formulation. In addition, other and better preservatives are available.

(PX–4A, pp. 84.)

The "Hempenstall Declaration" contained the following pertinent statements and data:

> In my laboratory it was found that for an aqueous based ranitidine formulation, a significant and surprising enhancement in the stability of the ranitidine is achieved by the addition of ethanol to the formulation. The advantageous effect resulting from the

addition of ethanol to an aqueous based ranitidine formulation can readily be determined by comparing the stability of the ranitidine in a formulation according to the present invention and the same formulation but without the added ethanol.

\* \* \* \* \* \*

Stability studies were carried out comparing this formulation with a formulation that was identical except that it did not contain ethanol. Samples of each formulation were stored at 30C̄, 37C̄, and 45C̄ for approximately 3 years ... At each temperature 2 samples of the formulation without ethanol, identified as Batches 1 and 2 were analysed with 3 samples of the formulation with ethanol identified as Batches 3, 4 and 5 ... The acceptable shelf life for an aqueous formulation containing ranitidine hydrochloride is considered to be the time at which no more than 5% of the ranitidine present in the formulation has degraded. Accordingly, the figure determined from the stability studies was the time (in months) for 5% ranitidine loss calculated as the lower 95% confidence limit. The results are as follows:

| Temperature | Without Ethanol | | With 7.5% Ethanol | | |
| --- | --- | --- | --- | --- | --- |
| | Batch 1 | Batch 2 | Batch 3 | Batch 4 | Batch 5 |
| 30°C | 12.5 | 13.6 | 19.5 | 17.0 | 20.8 |
| 37°C | 5.4 | 4.7 | 7.8 | 7.1 | 7.5 |
| 45°C | 1.8 | 2.3 | 2.9 | 2.9 | 2.8 |

From this data, Dr. Hempenstall concluded:

> Thus the formulation with ethanol has an average shelf life at 30C̄ of 19 months compared with 13 months when ethanol is excluded from the formulation. This is a highly significant and valuable improvement.

Dr. Hempenstall also included the following table to demonstrate the beneficial effect of ethanol on the stability of ranitidine in aqueous based formulations. The table gives the time (in months) for 5% ranitidine loss (calculated as the lower 95% confidence limit):

| Temperature | % Ethanol | | | | |
| --- | --- | --- | --- | --- | --- |
| | 0 | 2.5 | 5.0 | 7.5 | 10.0 |
| 37°C | 5.9 | 7.2 | 7.6 | 7.7 | 6.4 |
| 45°C | 2.1 | 2.4 | 2.4 | 2.6 | 2.7 |

(PX–4A, pp. 93–95.)

The data provided in the Hempenstall declaration proved persuasive. A Notice of Allowance was issued to Glaxo on June 3, 1991. (Stipulation 83.) Subsequently, on November 26, 1991, U.S. patent number 5,068,249, entitled Aqueous Ranitidine Compositions Stabilized with Ethanol issued to Glaxo.

## III. PHARMADYNE'S DEVELOPMENT OF THE ACCUSED PRODUCT

### A. Introduction

Pharmadyne's Ranitidine Oral Solution USP product covered by ANDA No. 74–794 (the "accused product") contains 12.5% propylene glycol and 25% sorbitol, by weight/volume of the total formulation. The accused product as filed under the ANDA No. 74–794 is a generic ranitidine oral solution composed of the following:

| Ingredient | Quantity per 1 mL |
|---|---|
| 1. Ranitidine Hydrochloride | 16.8 mg (equiv. to 15 mg/ml ranitidine) |
| 2. Dibasic Sodium Phosphate | 13.61 mg |
| 3. Citric Acid Anhydrous | 1.0 mg |
| 4. Saccharin Sodium | 1.0 mg |
| 5. Sorbitol Solution | 250 mg |
| 6. Propylene Glycol | 125 mg |
| 7. Methylparaben | 1.8 mg |
| 8. Propylparaben | 0.2 mg |
| 9. Natural Peppermint Extract | 5.0 mg |
| 10. Purified Water | Q.S. |

The regulatory specification for the pH of the ANDA product is 6.7 to 7.5. (PX–71, p. P01515.)

Samples from a 500 liter batch of the ANDA product achieved a pH of 7. (PX–71, pp. 01559–60.) Samples from the 500 liter ANDA batch were packaged in (i) 16 oz. PET bottle containers and (ii) 10 ml HDPE cups. (PX–71, pp. 01563–64.) The samples were tested for stability of the ranitidine active ingredient and for pH over time at 40C̃ at 75% relative humidity. (PX–71, pp. P01565–85.) Samples from the 500 liter ANDA batch consistently maintained a pH between 6.8 to 7. (PX–71, pp. P01571–85.) The results of Pharmadyne's testing of the accused product (over an 18 month period) for ranitidine content established a 29–month shelf-life for the ANDA product at 25–30C̃. (PX–94; PX–105; Wray Tr. at 835; Cartstensen Tr. at 2052–55.)

## B. The Effort to "Design Around" the Glaxo Patents

Dr. Anita K. Runyan, Director of Research and Development at UDL from October 1994 through September 1996, was in charge of Pharmadyne's development project for the ranitidine hydrochloride oral pharmaceutical formulation. She assigned to Dr. Prasad Gullapalli the task of developing the formulation. Dr. Gullapalli worked on the development project from 1994 until he left UDL in the summer of 1995. His job was to develop a ranitidine hydrochloride syrup formulation that had similar stability characteristics to that of Zantac syrup. To avoid infringing Glaxo's product, Dr. Gullapalli was instructed to stay outside the pH values claimed in the '249 patent, that is, 6.5–7.5, and to avoid using ethanol.

Instead of using ethanol, Dr. Gullapalli began developing a ranitidine syrup formulation using another alcohol, propylene glycol, and, at a pH of 6. Dr. Gullapalli's pH 6 formulation failed to meet UDL's stability criteria because the stability of the formulation failed to equal that of Zantac syrup. However, Dr. Gullapalli developed the pH 7 formulation that became the accused product. In a report dated March 7, 1995, Dr. Gullapalli concluded that "[s]tability improved with increase in pH of medium as expected, stability was not affected by type of buffer; [c]hange in pH of formulations with time was larger with increase in temperature and decrease in pH; [s]tability was not affected by buffer strength; [a]ll the solutions were stable for at least 5 days at 60C̃ in the presence of various polyols. However, more data has to [be] collected to make a positive conclusion." (PX–85, p. 11984.)

In Fall 1995, Dr. Gullapalli left UDL and Dr. Nathan Pathak assumed responsibility for the development project. He had joined the company in early 1995. Dr. Pathak's role was two-fold. First, he was asked to write a report on Dr. Gullapalli's pH 7 formulation, in the event it was needed by Pharmadyne to obtain approval of the accused product from the FDA. Second, Dr. Pathak was asked to reformulate Dr. Gullapalli's failed pH 6 formulation. Dr. Pathak's work on the accused product included reviewing and analyzing Dr. Gullapalli's work. He produced two development reports: the Ranitidine Oral Solution USP Pre–Development Report, (PX–91), and the Product Develop-

ment Report.[17] (PX–92; Pathak Tr. at 4056–59.) Pharmadyne's "Pre–Development Report" on the accused product, dated June 19, 1996, which was approved by Dr. Runyan, contains the following conclusions:

> As illustrated ... pH-rate profile of raniti-dine HCl in solution suggests the pH of optimum stability in the proximity of 7.3 ...
>
> Formulations with different co-solvents suggest.... Increase in sorbitol concen-tration from 12.5% to 50% ... leads to decrease in overall pH of solution, and also results in reduced shelf-life ... However, sorbitol solution at 25% level appears to be satisfactory in masking the taste of raniti-dine and propylene glycol in the formula-tion ... Increase in propylene glycol (>12.5%) improves the stability (better shelf-life), however, it contributes to the bitterness in the formulation.

(PX–91, P19024.)

## IV. ANALYSIS OF LEGAL CLAIMS AND DEFENSES

### A. Infringement of the '249 Patent

#### 1. Doctrine of Equivalents

▊ Glaxo had the burden of proving by a preponderance of the evidence that Phar-madyne's generic ranitidine oral solution, as specified and formulated in accordance with their ANDA No. 74–794, infringes claims 1 and 4–10 of the '249 patent. (The parties stipulated that ANDA No. 74–794 infringes claims of the '790 patent, and I make no findings as to that claim.). *SmithKline Di-agnostics, Inc. v. Helena Laboratories Corp.,* 859 F.2d 878, 889 (Fed.Cir.1988); *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1054 (Fed.Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). The parties agree that the accused product does not literally infringe the claims of the '249 patent. Literal infringement requires that every limitation found .in the patent claim exist in the accused product. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097

(1950). Here, the accused product does not literally infringe the '249 patent because the accused product does not contain the identi-cal alcohol—ethanol. Instead, the accused product contains propylene glycol, a sub-stance that is both an alcohol and a polyol.

The Supreme Court has explained that limiting infringement analysis to literal in-fringement "would place the inventor at the mercy of verbalism and would be subordinat-ing substance to form." *Id.* The Court rea-soned as follows:

> to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room—indeed encourage—the unscrupu-lous copyist to make unimportant and in-substantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of the law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. *Outright and forthright duplication is a dull and very rare type of infringement.*

*Id.* (emphasis added); *see Laitram Corp. v. Cambridge Wire Cloth Co.,* 863 F.2d 855, 859 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1068, 109 S.Ct. 2069, 104 L.Ed.2d 634 (1989). Ac-cordingly, even though the accused product does not meet all of the express terms of the '249 patent claims, the accused product can still infringe the patent under the doc-trine of equivalents. *Id.*

▊ The doctrine of equivalents pro-tects the patent owner against infringers who make insubstantial changes to the claimed invention, so that the accused product may not literally read on the claims, but nonethe-less appropriates the invention. *See War-ner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); *Graver Tank,* 339 U.S. at 607, 70 S.Ct. 854; *London v. Carson*

**17.** Dr. Pathak initially prepared one draft report. (PX–90.) He was instructed by Dr. Runyan to

break it into two parts.

*Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed. Cir.1991) ("[W]here an infringer ... merely makes an insubstantial change, essentially misappropriating or even 'stealing' the patented invention, infringement may lie under the doctrine of equivalents."). Patent protection is extended beyond the limitations set forth in the claims and specification to prevent competitors from making insubstantial changes by substituting equivalent ingredients that do not alter the function or properties of the patented composition. *Gillette Co. v. S.C. Johnson & Son, Inc.,* 12 U.S.P.Q.2d 1929, 1942 (D.Mass.1989), *aff'd,* 919 F.2d 720 (Fed.Cir.1990); *Continuous Curve Contact Lenses, Inc. v. National Patent Development Corp.,* 214 U.S.P.Q. 86, 117 (C.D.Cal.1982).

In *Graver Tank,* the Supreme Court set forth the "function-way-result" test which applies in determining infringement under the doctrine of equivalents. In applying the test in this case, the primary issue that must be addressed is whether the propylene glycol in the accused product performs the same function in the same way to obtain the same result as the 7.5% ethanol in the '249 patent.

Recently, the Supreme Court reaffirmed the validity of the doctrine of equivalents and clarified the scope of the doctrine. *See Warner-Jenkinson Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146. The Court held that the doctrine requires an evaluation of the accused product to determine whether it contains elements equivalent to each claimed element of the patented invention. *Warner-Jenkinson,* 520 U.S. at ——, 117 S.Ct. at 1054. "An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Id.* In the context of this case, additional factors that need to be considered under the doctrine include: 1) whether persons skilled in the art knew that propylene glycol was interchangeable with ethanol; 2) whether there is substantial evidence that

Pharmadyne simply copied the '249 patent; 3) whether there is evidence of independent development by Pharmadyne; and 4) whether Pharmadyne designed around the '249 patent. *See Warner-Jenkinson,* 520 U.S. ——, 117 S.Ct. at 1052–53, 137 L.Ed.2d 146.

2. Application to the facts in the case at bar

■ Here, Glaxo met its burden of establishing that the propylene glycol in the accused product performs the same work in substantially the same way and accomplishes the same result as the ethanol in Glaxo's '249 patent.

■ Determination of whether an accused product infringes requires a two step analysis. First, the court must construe the claims of the allegedly infringed patent. *Maxwell v. J. Baker, Inc.,* 86 F.3d 1098 (Fed.Cir.1996). *cert. denied,* —— U.S. ——, 117 S.Ct. 1244, 137 L.Ed.2d 327 (1997); *Tanabe Seiyaku Co., Ltd. v. U.S. International Trade Comm'n,* 109 F.3d 726, 729–30 (Fed. Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 624, 139 L.Ed.2d 605 (1997). Second, the Court must compare the claims of the patent to the accused product to see if they fall within the scope of the claims. *Id.*

■ Construing the claims of a patent is left to the Court because it is always a question of law. *Markman v. Westview Instruments Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In this instance, however, there is no dispute as to the construction of the claims of the '249 patent. The parties agree that the key claim limitation is Claim 1 and the critical dispute revolves around whether Pharmadyne's use of propylene glycol in the accused product is a mere substitution of the stabilizing ingredient, ethanol, in Claim 1 of the '249 patent. In their post trial memoranda on infringement of the '249 patent, the parties deal exclusively with claim 1. Accordingly, I shall focus on the issue of infringement of claim 1 only.[18]

---

**18.** Since Claim 1 is the only independent claim in the '249 patent, if the accused product does not infringe claim 1, it cannot infringe the dependent claims 4–10. *Wolverine World Wide, Inc. v.*

*Nike, Inc.* 38 F.3d 1192, 1199 (Fed.Cir.1994) (Where an independent patent claim is not infringed, the dependent claims are not infringed.);

Glaxo charges that the accused product is nothing more than a copy of the '249 patent. I so find. Throughout the litigation, Pharmadyne has maintained that the sole function of propylene glycol in the accused product is to act as a solvent for the paraben preservative system. A plethora of evidence in the record indicates this is not so. Despite Pharmadyne's claimed efforts to avoid copying the claims of the '249 patent, Pharmadyne has developed a formulation that is not substantially different from Glaxo's '249 patent. Convincing evidence of this fact is found in the stability studies conducted by Dr. Gullapalli. (PX–85.)

Glaxo proved its case primarily through its expert, Dr. Paul Eugene Wray.[19] He presented the most compelling analysis and evaluation of the data demonstrating that propylene glycol functions to stabilize ranitidine hydrochloride in the accused product in a manner similar to ethanol stabilizing the compound in the '249 patent.

The invention of the '249 patent is that ethanol enhances the chemical stability of ranitidine hydrochloride by retarding the degradation rate of ranitidine through hydrolysis.[20] In turn, the physical stability of ranitidine hydrochloride is increased and ultimately results in an extended shelf-life of the drug product. Dr. Wray described physical stability in terms of the maintenance of the physical characteristics of a drug product over the shelf-life of the product. For example, taste, color, odor, sedimentation, and pH are factors that should remain constant over the shelf-life of the product. (Wray Tr. at 481–82.) On the other hand, chemical stability is a measurement of the degradation rate of the active ingredient in a drug product:

[a]ll the drugs I have ever worked with in my career have finite degradation rates. They will last for a certain amount of time and be considered subpotent . . . [D]egradation rates are affected by . . . temperature . . . the higher the temperature quite often the faster the chemical degradation . . . [t]he pH of the solution . . . because . . . pH can affect the stability of the active ingredient as well as the stability of the excipients . . . ionic strength and dielectric constant . . . oxygen generally causes compounds to degrade.

(Wray Tr. at 482–84.)

In its post-trial memorandum, Pharmadyne contends that Glaxo failed to meet its burden under the *Graver Tank* "function-way-result" test because Drs. Wray and Long could not explain the exact mechanics of how ethanol stabilizes ranitidine. Pharmadyne argues that as a consequence, any conclusions reached by Dr. Wray regarding propylene glycol as a stabilizer are without foundation. This contention is unavailing.

Despite Drs. Wray and Long's failure to understand the exact mechanics of how ethanol stabilizes ranitidine hydrochloride, both reached the conclusion that ranitidine de-

see also *Wahpeton Canvas Co., Inc. v. Frontier, Inc.,* 870 F.2d 1546, 1553 (Fed.Cir.1989).

**19.** Dr. Wray is a principal at International Pharmaceutical Services, a consulting firm for pharmaceutical, biological and device organizations worldwide. For the past five years, Dr. Wray has been president of Wray Associates. Dr. Wray has over 30 years experience in the fields of pharmaceutical technology, pharmaceutical development, and production support. He has served as Director of Pharmaceutical Development for Ortho Pharmaceutical Corporation; Senior Director of Process Development and Technical Support, Worldwide, for R.W. Johnson Pharmaceutical Research Institute; and Director of Chemical Production at Wyeth Laboratories. At Johnson & Johnson, he was director of the laboratories responsible for the formulation of products of all dosage forms. Dr. Wray is a member of the adjunct faculty at Rutgers and Temple universities, teaching undergraduate and graduate courses in pharmaceutical processes and technology. He holds B.S. and M.S. degrees in Pharmacy from the University of Nebraska and a Ph.D. in Pharmaceutical Science from the University of Wisconsin. Dr. Wray's professional honors include being a Fellow of the Academy of Pharmaceutical Sciences and of the American Association of Pharmaceutical Scientists. (PX–120; Wray Tr. at 469–479.)

During his long-standing career in the pharmaceutical industry, Dr. Wray has acquired in-depth knowledge of all aspects of pharmaceutical development, including, but not limited to formulation development and process development. He is also knowledgeable about Investigational New Drug Applications and New Drug Applications. (*Id.*)

**20.** Hydrolysis is a chemical reaction in which water reacts with a substance. Hydrolysis causes active ingredients in drug products to lose their efficacy, i.e., their therapeutic value.

**286**

grades through hydrolysis and that ethanol retards the hydrolytic process. Dr. Long is not required to understand the exact mechanics of his invention, so long as the '249 patent discloses to the ordinary formulator how to make and use the invention. *See Micro Motion, Inc. v. Exac Corp.*, 741 F.Supp. 1426, 1441 (N.D.Cal.1990) (*citing Diamond Rubber Co. v. Consolidated Rubber Tire Co.*, 220 U.S. 428, 435–36, 31 S.Ct. 444, 55 L.Ed. 527 (1911)). Moreover, Dr. Wray's analysis of the results of Pharmadyne's stability studies on the stabilizing effect of propylene glycol on ranitidine hydrochloride convincingly establishes the similarity between the elements of the accused product and the '249 patent.

Dr. Wray critiqued Dr. Gullapalli's work on propylene glycol formulations with pHs in a range lower than that claimed in the '249 patent. Dr. Wray testified that these formulations were abandoned by Pharmadyne because the stability results were not on a level equal to the stability of the Zantac syrup that is based on the '249 patent. (Wray Tr. at 512–519.) Dr. Wray made it clear that even though Pharmadyne initially abandoned these propylene glycol formulations, data from comparative studies of these formulations establish that the closer Pharmadyne came to the pH range of 6.5–7.5, as claimed in the '249 patent, the more stable the propylene glycol formulations became. (Wray Tr. at 514, 516.) Using data obtained from Dr. Gullapalli's studies and memorialized in Pharmadyne's draft report, "Ranitidine Oral Solution Product Development Report," Dr. Wray evaluated Pharmadyne's study of nine formulations of the proposed accused product but at different pH levels, ranging from 4.27 to 8.8. (Wray Tr. at 805–808; PX–90.) Dr. Wray testified that data from the study indicated that the lowest decomposition rate of ranitidine was observed at a pH of 7.28. (Wray Tr. at 805–06; PX–90, p. P19073.) He said that based on this data, the shelf-life of the product would be the longest at pH 7.28. (Wray Tr. at 807–08.)

Dr. Wray explained the results of yet another study in which Pharmadyne evaluated the effect of various polyols, including propylene glycol, glycerin and sorbitol, in different concentrations but all with an approximate pH of 6, on the degradation rate of ranitidine. (Wray Tr. at 808–09; PX 90, P19082.) The formulations that had the longest predicted shelf-lives contained propylene glycol in two concentrations, 12.5% and 38%. Dr. Wray testified that the formulation containing 12.5% propylene glycol in combination with 25% sorbitol had a predicted shelf-life of only 18 months compared to the 116 months for the two propylene glycol only formulations. (Wray Tr. at 811–12, PX–90, P19082.)

Pharmadyne's study comparing the propylene glycol formulations with two different buffer systems showed that the stability of ranitidine increases with a higher pH. (PX–90.) Pharmadyne's real time studies of the accused product show that over an 18 month period, Pharmadyne stored samples of the accused product at room temperature and measured the pH and ranitidine content at intervals of 3, 6, 9, 12, and 18 months. (Wray Tr. at 837–839; PX–94.) Over the 18 month period the pH essentially remained constant at a pH of 7.0. The lowest pH value achieved was 6.8. (Wray Tr. at 837; PX–94.) This same study showed that the ranitidine content decreased only slightly over the 18 month time period and was almost unchanged. (Wray Tr. at 837–38; PX–94.)

Using Pharmadyne's stability studies, Dr. Wray compared Pharmadyne's stability data on the accused product containing 12.5% propylene glycol to Glaxo's studies on the patent formulation and formulation without ethanol. He looked at equal samples of each product based on 18 month data. The data for Glaxo's syrup without ethanol, however, was based on a 12 month study. Pharmadyne's product was stored at temperatures ranging from 25–30C̆. Glaxo's stability data was drawn at 30C̆. (Wray Tr. at 843–849.) Comparing this data, Dr. Wray concluded that Glaxo's product without ethanol had a shelf-life of 27.7 months. The shelf-life increased by 20% to 33.4 months, when ethanol was added. The accused product containing propylene glycol had a shelf-life of 29 months which represented a 5% increase over the stability of the formulation without propylene glycol. (Wray Tr. at 844–47; PX–105.) Dr. Wray attributed the difference between Zan-

tac syrup with ethanol's 20% increase in stability, on the one hand, and the accused product, which had a 5 percent increase in stability, to the presence of sorbitol in the accused product:

Q: Dr. Wray, to what do you attribute the difference between Zantac syrup with ethanol, which has a 20 percent improvement in stability, and the Pharmadyne syrup with propylene glycol, which has a 5 percent improvement in stability?

A: Well, here I would have to go back to their development report, the UDL development report. UDL had data for the syrup, for the oral solution, with propylene glycol alone. But then they also had data for the syrup or the oral solution with propylene glycol and sorbitol.... I noted that the Pharmadyne product contains 25 percent sorbitol as opposed to the Glaxo product containing 10 percent sorbitol. Their data, in an accelerated stability study, showed that the presence of sorbitol did reduce the expected shelf-life of the product when compared to the product with just propylene glycol.... So, what I concluded here is that they made a decision that a 29 month shelf-life was acceptable, and they needed the presence of sorbitol to give the appropriate taste which they said in their development report, because propylene glycol was somewhat difficult to mask in flavor.... So, I think it was a conscious decision. I think that the 5 percent increase is indicative of the formula with propylene glycol and sorbitol. *But I also have no doubt that the Pharmadyne product*

*with propylene glycol alone would have shown stability increase approximating that of the Zantac product with ethanol.*

(Wray Tr. at 846–47.) (emphasis added).

Glaxo presented highly persuasive evidence demonstrating that propylene glycol in the accused product is the functional equivalent of ethanol in the '249 patent. (Wray Tr. at 830–33, 1346.) Dr. Wray testified that if Pharmadyne had substituted a chemical compound other than propylene glycol for the ethanol, he believed that that particular product would not have produced stability results equivalent to that produced by ethanol. In support of his contention, Dr. Wray testified that in the scientific community it is well established that propylene glycol is an alcohol as well as a polyol.[21] He opined that Pharmadyne chose propylene glycol because it is one of a limited number of alcohols that is approved for use in pharmaceutical products and of the other approved alcohols it is the closest in chemical structure and has similar properties to ethanol.[22] It was his opinion that propylene glycol "would be a prime candidate for replacement of ethanol and for evaluation as to its potential for having the same stabilizing effect as ethanol." (Wray Tr. at 830.) He was also of the opinion that as a consequence of possessing similarities in chemical structure and properties, both propylene glycol and ethanol would have a similar, if not the same, affect on the stability of ranitidine hydrochloride in an oral pharmaceutical product having similar or the same components. Dr. Wray testified further that the chemical structures and properties of the other alcohols approved for use in pharmaceutical products would have made

21. At the initiation of this action, a hotly contested issue was whether propylene glycol was an alcohol. Pharmadyne insisted that propylene glycol was a polyol and not an alcohol. Notwithstanding Pharmadyne's position, its own expert, Dr. Carstensen acknowledged that indeed propylene glycol is an alcohol as well as a polyol. However, he testified that the propylene glycol in the accused product did not produce the stabilizing effect that is produced by the ethanol in the '249 patent. In fact, he testified that the accused product is even less stable than Glaxo's product without the 7.5% ethanol. Notwithstanding his testimony at trial, Dr. Carstensen at

deposition indicated that both propylene glycol and ethanol have a tendency to stabilize a drug compound, such as ranitidine hydrochloride, in a medication. (Carstensen Tr. at 1729.)

22. The FDA maintains a list of components that are considered safe for pharmaceutical formulations—the GRAS ("Generally Known as Safe") list. Included on this list are the alcohols—ethanol, propylene glycol, and sorbitol. (PX–34; Tr. at 829.) The GRAS list also includes three more alcohols that are used as food additives; mannitol, glycerol, and polyethylene glycol.

288

them difficult to work with. As an example, Dr. Wray stated that Pharmadyne did not select mannitol because in its natural state it is a solid and would have to be dissolved in a solvent prior to use. (Wray Tr. at 831.) He noted that polyethylene glycol has a wide range of molecular weights whereas propylene glycol does not have a range of molecular weights.

Dr. Wray's testimony on this subject was bolstered by the testimony of Dr. Joel Bernstein who was called as a witness by Glaxo to testify on matters related to chemistry.[23] Dr. Bernstein testified that chemists characterize organic compounds such as alcohols by the functional group they contain. (Bernstein Tr. at 238.) In the case of alcohols, the functional group is the hydroxyl group. Dr. Bernstein explained that organic compounds in the same functional group are formed in the same way, react in the same way, and have the same properties. (Bernstein Tr. at 238; PX–369A.) The stability data and testimony of Drs. Wray and Bernstein, taken as a whole, overwhelmingly support a finding that the propylene glycol in the accused product performs the same function as ethanol ·in the '249 patent. It is apparent that propylene glycol in the accused product is the functional equivalent of ethanol in the '249 patent.

I find that Pharmadyne was aware that propylene glycol could be substituted for ethanol and that Pharmadyne developed the accused product by copying the '249 patent. The evidence of record shows that very little independent research went into developing the accused product. In fact, the only evidence of independent research is the testing of the polyol-alcohols to determine which one produced stability results similar to that achieved by the ethanol in the '249 patent and testing for choice of buffer system. Dr. Gullapalli testified that his goal was to develop a formulation that possessed stability characteristics similar to Zantac syrup. Even before he began the development of the accused product, Dr. Gullapalli assessed the composition of Zantac syrup by reviewing the Zantac syrup formulation, obtaining an actual sample of the syrup, and testing it for content. And, he studied the '249 patent. Using this information, Dr. Gullapalli made a small amount of the Zantac product in his laboratory. He then began development of the accused product.[24]

Dr. Gullapalli's laboratory notes reflect that he considered using various polyols, but experimented primarily with propylene glycol. Dr. Gullapalli testified that he immediately chose propylene glycol. But, he testified that he chose propylene glycol because he knew that it was a good solvent and that he would need a solvent to dissolve the paraben preservative system in the formulation.

I give little credence to Dr. Gullapalli's testimony that he chose propylene glycol to act solely as a solvent or to Pharmadyne's contention presented throughout the trial, that propylene glycol acts solely as a solvent in the accused product. Drs. Wray and Carstensen both testified that the 12.5% propylene glycol in the accused product exceeds the amount needed to dissolve the parabens.[25] Indeed, Dr. Carstensen testified fur-

23. Dr. Bernstein has a B.A. in Chemistry from Cornell University and a M.Sc. and Ph.D. from Yale University. His postdoctoral work has been in chemistry and crystallography at U.C.L.A. and the Weizmann Institute of Science in Rehovot, Israel. Dr. Bernstein is a consultant for companies in the areas of chemistry and crystallography. He is currently a Professor of Chemistry at Ben–Gurion University in the Negev in Beer-Sheva, Israel. He has taught undergraduate and graduate chemistry for the last 35 years. The majority of Dr. Bernstein's publications have dealt with the characterization of polymorphic materials and the relationship between polymorphisms and the properties of those materials. He has had an ongoing interest in polymorphism for the past 30 years. (Bernstein Tr. at 229–232; PX–123.)

24. I have taken into account the fact that Pharmadyne needed to establish bioequivalency between its product and Zantac syrup in order to obtain approval of its product as meeting USP specifications. This allows the generic manufacturer to label its product USP. (Wray Tr. at 822.)

25. Dr. Jens Thurθ Carstensen was Pharmadyne's key expert witness. He is Professor Emeritus of Pharmacy at the University of Wisconsin. He received his M.S. degree in Chemical Engineering from the Technical University of Denmark. He also holds M.S. and Ph.D. degrees in Physical Chemistry. Prior to becoming a university professor, Dr. Carstensen worked approximately 17 years in the pharmaceutical industry, from 1950–1967. Dr. Carstensen's research interest lies primarily in the area of materials science (solid

ther that Pharmadyne used thousands of times more propylene glycol than was necessary to dissolve the propylene glycol than was necessary to dissolve the parabens. (Carstensen Tr. at 2018–19.) Dr. Carstensen even acknowledged that if "[s]olubilization is the purpose, one would in general" not use such an excessive amount of solvent. He admitted that the amount of water contained in Pharmadyne's ANDA formulation was enough to dissolve the parabens if heat was used. (Carstensen Tr. at 2019.) Dr. Wray shared this view.

Drs. Runyan and Gullapalli testified that their primary goal in developing the accused product was to create a product that possessed stability characteristics similar to those of Zantac syrup but at a pH value lower than the pH claimed in the '249 patent. Dr. Runyan's deposition testimony makes it clear that she had studied the '249 patent and understood the claim that ethanol stabilizes ranitidine:

Q: To the best of your recollection, what was your understanding or conclusion that you reached after reading the '249 patent?
R: Understanding that the addition of ethanol to an aqueous formulation of ranitidine is supposedly claimed to enhance stability. That's what I felt when I read it.
Q: Do you have any different conclusion as we sit here today?
R: No.

(PX–96; PX–375, p. 92.) She testified that she selected the 12.5% propylene glycol and 25% sorbitol combination because

In addition to looking at the effect of polyols on stability, we were looking at the other things. As I mentioned, viscosity, palatability, which would be taste. So this was the combination that gave use those

desired characteristics in addition to the stability.

Dr. Runyan was keenly aware that the polyols, such as propylene glycol, might produce a stabilizing effect. At deposition, she was asked:

Q: The exploration of the polyols or the co-solvents as we discussed as potential stabilizers that work was conducted after you reviewed the '249 patent, isn't that correct?
R: Yes.

(PX–96; PX–375, p. 93.)

Under Dr. Runyan's tutelage, Dr. Gullapalli developed the formulation that became the accused product. Although they initially considered developing an oral solution of ranitidine hydrochloride different from Glaxo's, but with similar stability characteristics, they realized that it was a monumental task, if not an impossible one. Dr. Gullapalli's formulation not only needed the propylene glycol, but it had been proven through the stability studies that the pH had to be in the range covered by the '249 patent. Dr. Gullapalli concluded (and the record of his work reflects) that he had achieved his goal of formulating a ranitidine hydrochloride solution with similar stability characteristics to those of Zantac syrup.[26] (PX–369, pp. 35–36.). At bottom, however, he simply developed a final product that is substantially the same product that is claimed in the '249 patent.

Pharmadyne sought to rely on the testimony of Dr. Carstensen, who stressed that there were notable differences between propylene glycol and ethanol. Dr. Carstensen testified that propylene glycol is dissimilar to ethanol in that it is less flammable than

---

state kinetics and properties and kinetics of solid liquid interfaces). Over the past 30 years, he has taught "industrial short courses" which are courses for professionals who are working in formulation development in the pharmaceutical industry. Dr. Carstensen's curriculum vitae reflects that he is a most distinguished scholar of pharmaceutical sciences. He has published a myriad of articles covering various aspects of the pharmaceutical sciences, is the author of four textbooks on the theory of pharmaceutical systems, and has been a presenter/speaker at numerous conferences and meetings. Notably, five United States patents and one Belgian patent

have been issued in Dr. Carstensen's name. Dr. Carstensen has received numerous awards, including the Ebert Price in 1976 and the Research Achievement Award in 1977. Recently Dr. Carstensen was appointed to the Food and Drug Administration's Advisory Committee on Pharmaceutical Sciences. (Carstensen Tr. at 1637–1644. DX–71.)

26. Dr. Gullapalli questioned whether he had achieved this objective with respect to the pH 6 formulation, but he was certain that he had achieved his goal for the pH 7 formulation.

ethanol, has a higher boiling point than ethanol, and has two adjacent hydroxyl groups as compared to the one hydroxyl group in ethanol.[27] Pharmadyne contends that these differences demonstrate both that propylene glycol does not function in a manner similar to the ethanol in the '249 patent and that the scope of the '249 patent is limited to ethanol and does not encompass other alcohols. (Defs.' Post Trial Mem. at 5–8.)

I am not persuaded by Dr. Carstensen's testimony and give it scant weight. The evidence indicates that Drs. Runyan and Gullapalli selected propylene glycol on the basis of its familial connection to ethanol and their knowledge that its chemical properties would likely produce the stabilizing effect they sought to duplicate. Likewise, Dr. Gullapalli's studies demonstrate that propylene glycol has a similar, if not, in fact, a better stabilizing effect on ranitidine hydrochloride. The studies show that the 12.5% propylene glycol alone would most likely have produced a product that equaled the stability of the '249 patent. The only reason that the accused product's shelf-life is shorter than the Zantac syrup is more likely than not due to the amount of sorbitol that Pharmadyne incorporated into its product to make it more palatable.

Pharmadyne asserts that further support for its position that propylene glycol is not a surrogate for ethanol, is found in the case of *Tanabe Seiyaku,* 109 F.3d at 732–34. In *Tanabe Seiyaku,* the issues on appeal were whether the United States International Trade Commission had properly construed claim 1 of a patent covering a process for preparing a pharmaceutical product used to treat cardiovascular diseases and whether the Commission properly limited the scope of the doctrine of equivalents to hold that the use of butanone in the process instead of acetone as claimed in the patent claim was non-infringing. *Id.* at 728–29. The process claimed in the patent involved the use of five combinations of bases and solvents using acetone and lower alkyl acetates as solvents. The accused product used butanone as a solvent instead. *Id.* at 729. The evidence established that both butanone and acetone are ketones; have the same functional group, called a carbonyl group: (-C=); and are homologs differing only in that butanone has an additional methylene group (-CH). *Id.* The prosecution history of the patent demonstrated that Tanabe limited the claims of the patent to the five base-solvent combinations and that other ketone solvents did not produce the yields that Tanabe wanted. *Id.* at 732. The court considered the fact that butanone had been rejected by Tanabe in an experiment conducted on its behalf prior to the filing of its patent application, and concluded that the rejection by the patentee provided evidence of "a substantial difference between the claimed and accused process." *Id.* at 732–33. The court stated:

> In the present case, the representations made to foreign patent offices are relevant to determine whether a person skilled in the art would consider butanone or other ketones to be interchangeable with acetone in Tanabe's claimed . . . reaction. Because Tanabe represented that its "specific base-solvent combinations" distinguish its process from the prior art, Tanabe's statements to foreign patent offices suggest to a person skilled in the art that other solvents, including butanone, may not be interchangeable with the claimed solvents.

*Id.* at 733. The court affirmed the decision holding that the Commission had properly limited the scope of the doctrine of equivalents because the patent claim was limited to the five base-solvent combinations disclosed in the patent. *Id.* at 734.

I am not persuaded that *Tanabe Seiyaku* is applicable to the facts presented here. In *Tanabe Seiyaku,* there was evidence that butanone did not react similarly to acetone and, thus, was rejected by Tanabe as a possible element to claim in the process. The court viewed this rejection as an indication that butanone and acetone were not interchangeable in Tanabe's process. Pharmadyne argues that Glaxo similarly rejected propylene glycol. This contention is only partially true. While it is true that Glaxo rejected propylene glycol it did so only as to

27. Alcohols are a class of organic compounds containing one or more hydroxyl groups. A hydroxyl group is characterized by an oxygen and hydrogen molecule together.

its use as an agent against *pseudomonas cepacia*, not as an agent for stabilization. Nothing in the prosecution history of the '249 patent shows that Glaxo considered the use of propylene glycol or any other constituent as a stabilizer. The evidence reflects that the invention came as a surprise and was not an intended result.

Pharmadyne argues that Dr. Wray never determined whether a component in the accused product, other than the propylene glycol, acts as a stabilizer. Pharmadyne asserts that the possibility exists that one of the other chemical compounds in the accused product has a stabilizing effect on the ranitidine hydrochloride. This contention is misplaced. Nothing in the record supports a finding that something other than propylene glycol acts a stabilizer in the accused product. Moreover, Glaxo is not required to prove that another component in the accused product acts as a stabilizer. If Pharmadyne had evidence that something other than propylene glycol stabilizes the accused product, it should have produced such evidence at trial. Dr. Wray's testimony is credible and is supported by the evidence. Pharmadyne has offered no evidence of significant probative value to refute Dr. Wray's testimony or the work of its own formulator, Dr. Gullapalli.

█ The use of chemical substitutes for patented ingredients that are from the same family of chemicals may constitute infringement under the doctrine of equivalents. *Graver Tank,* 339 U.S. at 607–08, 70 S.Ct. 854; *Saes Getters S.P.A. v. Ergenics, Inc.,* 17 U.S.P.Q.2d 1581, 1589 (D.N.J.), *aff'd,* 914 F.2d 270 (Fed.Cir.1990); *but see Tanabe Seiyaku,* 109 F.3d at 734. Glaxo presented substantial, credible evidence that propylene glycol stabilizes ranitidine in the accused product as does ethanol in the '249 patent and that the accused product is not insubstantially different from, nor an improvement over the '249 patent.

Pharmadyne's two key witnesses who were charged with establishing the difference between the accused product and the '249 patent were unconvincing and their testimony was unreliable. Drs. Pathak and Carstensen's testimony was critical to rebutting the case of infringement established by Glaxo.

But their testimony carries little weight in this case. At trial, Dr. Pathak testified that six days before he was scheduled to testify he discovered an error in his analysis of Dr. Gullapalli's work. He stated that he realized, for the first time, that his conclusions that propylene glycol improves and sorbitol negatively impacts stability were incorrect. (Pathak Tr. at 4073–76.) Dr. Pathak believed that buffer concentration significantly affects stability of ranitidine hydrochloride solutions: a high buffer concentration results in lower stability. Directing the court's attention to Dr. Gullapalli's studies, Dr. Pathak stated that the various formulations used by Dr. Gullapalli had different buffer concentrations and, therefore, a reliable comparison of the formulations could not be done. He did confirm, however, that Dr. Gullapalli's data was valid and only his analysis and conclusions were incorrect. When I questioned Dr. Pathak as to how he could have made such a tremendous error in interpreting Dr. Gullapalli's work, as he described, and have only realized it days before he was scheduled to testify, he replied that he had been in a hurry: "Your Honor, I was in a hurry. I wanted to get the report done. This was a draft copy which I did. So, maybe it slipped my mind. It slipped my observation." (Pathak Tr. at 4081.)

Upon reflection on Dr. Pathak's work on reformulating Dr. Gullapalli's failed pH 6 formulation, I see some basis for his conclusion that buffer strength is a critical element of formulation development with regard to the formulations at issue in this case. In his reformulation work, Dr. Pathak concluded that Dr. Gullapalli's pH 6 formulation failed because it had too much buffer in it at that pH level. He reformulated the failed pH 6 formulation by decreasing the buffer concentration from 50 millimolars to 20 millimolars, keeping the pH constant and the buffer ratio the same. In December 1995, he tested a lab batch of 400 milliliters, studying the formulation at 35, 64, and 90 days under the FDA required temperature of 40C̃ and 75% relative humidity. He also made a stability test comparison for his reformulated pH 6 formulation, and Dr. Gullapalli's pH 6 and 7 (the accused product) formulations. All three for-

mulations contained the same ingredients and the same amount of ranitidine hydrochloride, except Dr. Pathak's used a 20 millimolar buffer concentration as opposed to Dr. Gullapalli's 50 millimolar buffer system. Based on the comparison study, Dr. Pathak concluded that his pH 6 formulation was more stable than the accused product because its buffer concentration was lower. (Pathak Tr. at 4022–23.) Nevertheless, Dr. Pathak testified that he really could not make a true comparison of the three formulations because his pH 6 batch was smaller than the others. (Pathak Tr. at 4022–23, 4032.)

Dr. Carstensen's spin on the importance of buffer concentration on stability was similar to Dr. Pathak's position. He, too, however, could offer no well-reasoned, rational explanation of how buffer concentration affected stability. On cross-examination the following colloquy took place between Glaxo's counsel and Dr. Carstensen:

Q: This study, concerning the subject of this study showed that a four times increase had no effect as measured by Dr. Gullapalli on aqueous ranitidine hydrochloride of Pharmadyne's making, no effect whatsoever on stability; that's correct, is it not?

C: On Pharmadyne's formula, that is right.

\* \* \* \* \* \*

Q: Obviously being aware of it, you had the opportunity of mentioning it and then telling us during your direct examination of the kinds of things that you just mentioned about why it wasn't pertinent or why it wasn't relevant. You took it upon yourself to make a decision that it wasn't relevant and you didn't talk about it. That's what happened yesterday, wasn't it?

C: The thing that happened is that I have information that is contrary to what is in this document in the sense that there have been subsequent experiments done in which exactly the same formulation containing a whole lot less buffer is more stable. So if you want me to substantiate the fact that buffer

has an effect on this formula, well, yes, it does, because at very low buffer concentration that is, indeed, an effect, and that effect is the type of effect that I would expect and it's also the type of effect that I would have expected from reading the Glaxo documents.

(Carstensen Tr. at 3813–15.)

Dr. Carstensen failed to clarify or bolster his naked opinion testimony with data from the experiments he testified about. He also failed to direct the court's attention to the Glaxo documents which he said held the answer to the buffer question. Contrarily, Dr. Wray, through an evaluation of the buffer concentrations contained in Dr. Gullapalli's formulations about which Dr. Pathak testified he had misevaluated, presented a logical and methodical explanation of why Drs. Pathak and Carstensen's conclusion that high buffer concentrations have a negative effect on the stability of ranitidine hydrochloride, is wrong. (Wray Tr. at 4830–32.)

Drs. Pathak and Carstensen's trial testimony regarding whether propylene glycol in the accused product acts similarly to ethanol in the '249 patent was weakened by their inability to establish that their opinions and conclusions were based on scientific method. Dr. Pathak's trial testimony directly contradicted his deposition testimony and his analysis of Dr. Gullapalli's work. Moreover, Pharmadyne failed to reconcile the contradictions. In the wake of Dr. Carstensen's monstrous error in classifying ranitidine as an amide and grounding his analysis of the data on this erroneous conclusion and Dr. Pathak's testimony that he too made a significant error, I am possessed of profound uneasiness in respect to the reliability and credibility of Pharmadyne's key witnesses. On the other hand, I find the testimony of Drs. Wray, Gullapalli, and Runyan on the issue of the accused product having similar stability to the patent formulation, more plausible and trustworthy. Dr. Runyan reviewed and approved the work of her subordinates, Drs. Gullapalli and Pathak. She checked their data for accuracy and was ultimately responsible for the success or failure of the project. No evidence was produced to show that she

disagreed with their work or conclusions. Accordingly, for all these reasons, I find by a preponderance of the evidence that ANDA No. 74–794 infringes the claims of Glaxo's '249 patent.

B. Affirmative Defenses and Declaratory Judgment Issues

1. Obviousness: The '790 and '249 Patents

a. Presumption of Validity

 "A patent is presumed valid and the party asserting invalidity must overcome this presumption by clear and convincing evidence establishing facts which support the conclusion of invalidity." *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). My task here is clear:

> The presumption, like all legal presumptions, is a procedural device, not substantive law. It does require the decisionmaker to employ a decisional approach that starts with acceptance of the patent claims as valid and that looks to the challenger for proof of the contrary. Thus the party asserting invalidity not only has the procedural burden of proceeding first and establishing a prima-facie case, but the burden of persuasion on the merits remains with that party until final decision. The party supporting validity has no initial burden to prove validity, having been given a procedural advantage requiring that he come forward only after a prima-facie case of invalidity has been made. With all the evidence in, the trial court must determine whether the party on which the statute imposes the burden of persuasion has carried that burden.

*Stratoflex, Inc. v. Aeroquip, Corp.,* 713 F.2d 1530, 1534 (Fed.Cir.1983). Moreover, deference must be given to the decision of the patent examiner to issue the patent. *See Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 447 (Fed.Cir. 1986) ("Finally, the examiner, who with the deference we owe governmental officials we assume has some expertise in interpreting the references and some familiarity with the level of skill in the art."), *cert. denied,* 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987).

This deference, however, is only due when relevant prior art has been cited to the patent examiner. In *Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437 (Fed.Cir. 1984), the court stated:

> [N]ew prior art not before the PTO ... has no effect on the presumption [of validity] or on who has the burden of proof. They are static and in reality different expressions of the same thing—a single hurdle to be cleared.... [The effect] of new prior art ... is to eliminate or at least reduce, the element of deference due the PTO, thereby partially, if not wholly, discharging the attacker's burden ... [but neither shifting nor lightening it or changing the standard of proof.]

*Id.* at 1443 (quoting *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1358–60 (Fed.Cir.1984), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

A patent is invalid for obviousness if the differences between the subject matter patented and the prior art are such that the patented subject matter as a whole would have been obvious to a person of ordinary skill in the art. 35 U.S.C.A. § 103. Obviousness is determined as a matter of law. *Graham,* 383 U.S. at 17, 86 S.Ct. 684. "The Court must evaluate the prior art in light of the problem that the inventor sought to solve. The problem confronted by the inventor must be considered in determining whether it would have been obvious to combine references in order to solve that problem.'" *Endress & Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.,* 892 F.Supp. 1107, 1119 (S.D.Ind.1995) (*quoting Diversitech Corp. v. Century Steps, Inc.,* 850 F.2d 675, 678–79 (Fed.Cir.1988)), *aff'd,* 122 F.3d 1040 (Fed.Cir.1997).

 The scope and content of the prior art are first determined. *Graham,* 383 U.S. at 17, 86 S.Ct. 684. The prior art must be reasonably pertinent to the particular problem with which the inventor was involved. The prior art encompasses not only the field of the inventor's endeavor but also any "analogous art." *In re GPAC Inc..,* 57 F.3d 1573, 1577–78 (Fed.Cir.1995). "A reference is 'analogous art' when a person of ordinary skill would reasonably have consulted it and

applied its teachings in seeking a solution to the problem that the inventor was attempting to solve." *Markman v.. Lehman,* 987 F.Supp. 25, 29 (D.D.C.1997) (*citing In re GPAC,* 57 F.3d at 1577–78). Second, a determination of the differences between the prior art and the claims at issue must be made. Finally, the court must evaluate any objective evidence of nonobviousness such as commercial success, long felt but unsolved needs, failure of others to design the invention and unexpected results. *Graham,* 383 U.S. at 17, 86 S.Ct. 684; *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1573 (Fed. Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *W.L. Gore & Associates, Inc. v. Garlock, Inc.* 721 F.2d 1540, 1545 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

The secondary factual considerations "may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art." *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538–39 (Fed.Cir.1983). Such factors are but a part of the "totality of the evidence" that is used to reach the ultimate conclusion of obviousness. *Richardson–Vicks, Inc. v. Upjohn Co.,* 122 F.3d 1476, 1483 (Fed.Cir.1997) (*citing Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir.1983)). The prior art must first make out a prima facie case for obviousness, which prima facie case can possibly be rebutted by the "secondary considerations." *Graham,* 383 U.S. at 18, 86 S.Ct. 684; *Cf. Medtronic, Inc. v. Intermedics, Inc.,* 799 F.2d 734, 738 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987).

Based on these standards, as set forth below, I find that the claims of the '790 and '249 patents are not invalid for obviousness. Pharmadyne has failed to demonstrate by clear and convincing evidence that the references on which they rely "taken as a whole, would have suggested [Glaxo's] invention to one of ordinary skill in the [pharma-

ceutical development] arts at the time the invention was made." *In re Merck & Co., Inc.,* 800 F.2d 1091, 1097 (Fed.Cir.1986).

### b. '790 Prior Art

█ The '790 patent has an effective filing date of May 13, 1983, and thus prior art is measured as being prior to that date. Prior art references relied upon by Pharmadyne include the Padfield Article; Glaxo's '658, '431, '614, and '819 patents; and excerpts from THE THEORY AND PRACTICE OF INDUSTRIAL PHARMACY (Leon Lachman, et al. eds., Lea & Febiger 1970) and REMINGTON'S PHARMACEUTICAL SCIENCES (John E. Hoover, et al. eds., Mack Publishing Co. 15th ed.1975). Of these references, Glaxo advised the patent examiner of only the "Padfield Article" and the '658 patent. Accordingly, Pharmadyne's burden is not as demanding as it would have been had the PTO examined all references Pharmadyne cites as prior art. Regardless, Pharmadyne's evidence of obviousness must be clear and convincing. *American Hoist,* 725 F.2d at 1358–60.

With the exception of the '431 patent, each of the patent references establishes the importance of pH in formulating pharmaceutical products.

The '658 patent covers ranitidine hydrochloride (Form 1) and suggests that it can be used as an injectable or syrup. (Carstensen Tr. at 3440; DX–39, col. 29.) Example 33b of the '658 patent contains a formula for making a ranitidine injectable solution and discloses that acid is added slowly until the pH reaches 5.0. (PX–6, col. 29, lines 12–26.) The '658 patent discusses that making a ranitidine syrup would involve dissolving the ranitidine in "water ... by adding gradually hydrochloride acid until the pH has fallen to 5.0. The Sorbitol Solution, flavour and the rest of the water are added and the pH is readjusted to 5.0." (Carstensen Tr. at 3440–41; DX–39, col. 29.)

Glaxo's '614 and '819 patents relate to a class of compounds called "alpha, omega-disubstituted polymethylene compounds." The compounds are analogs of ranitidine. The patents contain examples illustrating that the compounds claimed can be formulated into a pharmaceutical product in the form of a tab-

let or solution. Examples of the injectable solutions carry the following language: "[s]odium chloride may be added to adjust the tonicity of the solution and the pH may be adjusted to that of maximum stability and/or to facilitate solution of the active ingredient using either dilute acid or alkali." (DX–53, col. 16; DX–54, col. 16.)

The '431 patent covers ranitidine hydrochloride (Form 2), but it does not contain any information or statements regarding pH. The '431 patent, however, establishes that a syrup can be made with ranitidine hydrochloride. (Carstensen Tr. at 3437–38; DX–40.)

The "Padfield Article" discloses that with respect to the injectable solution "[a]ccelerated pH and temperature stability studies indicated that the injection was most stable at its 'natural pH' but its shelf life is dependent upon the storage temperature." (DX–28, pp. 19–20.) The term "natural pH" was used by the authors to mean the pH of a simple solution of ranitidine hydrochloride dissolved in water without any pH adjustment. Glaxo scientists concluded that the injectable solution was most stable at its "natural pH," i.e. about 5.5, after conducting stability studies to examine the effects of pH on the stability of ranitidine. (PX–53; PX–55.)

*Remington's* is used by pharmaceutical educators and is available to people in the pharmaceutical industry. (Carstensen Tr. at 2805.) Pharmadyne directed this Court's attention to specific text which recites:

One of the most diversified and fruitful areas of study is the investigation of the effect of hydrogen-ion concentration on the stability, or in more general terms the reactivity, of pharmaceutical systems. The evidence for enhanced stability of systems when these are maintained within a narrow range of pH, as well as of progressively decreasing stability as the pH departs from the optimum range, is abundant.

(DX–109; DX–108, p. 273; Carstensen Tr. at 2804.) Dr. Carstensen testified that this text "very adequately and very eloquently portrays the things that a formulator would be familiar with and that he would pay heed to when he did formulations." (Carstensen Tr. at 2806.) Dr. Carstensen believed that as a matter of routine formulation development, formulators conduct pH profiles because they have been taught that profiles are useful tools in determining the range of pH for maximum stability. (Carstensen Tr. at 2806–07.) He testified that *Remington's* and *Lachman* establish that prior to the claimed invention, it was an industry-wide practice and a matter of routine exploration for formulators to perform pH profiles prior to developing aqueous pharmaceutical products. He said that this is particularly true where the formulator is developing a liquid product as opposed to a solid product, and where the drug compound used is labile. Dr. Carstensen spoke of his experiences in this area and of the instances where he had observed products with greater than a 10–fold increase in stability resulting from a change in pH. (Carstensen Tr. at 2807–09, 2826, 2832–35, 3870.)

Pharmadyne also cited as prior art the chart of the pH profile of the ester, atropine, which is represented in *Remington's* as follows:

Fig. 19–4. Apparent first-order rate of hydrolysis of atropine as a function of pH at 30°C. The reaction is an illustration of specific hydrogen- and hydroxide-ion catalysis (courtesy, data, Kondritzer and Zvirblis[1]).

Figure 19–4 charts the pH profile of atropine, and instructs that the minimum rate of hydrolysis is at pH 3.7. Dr. Carstensen testified that this art reference demonstrates that performing a pH profile can result in a 10–fold increase in stability simply by changing the pH by one unit. (Carstensen Tr. at 2822–24, 2833; DX–108, p. 280.)

*Lachman* is found in university libraries and industrial pharmaceutical laboratories. (Carstensen Tr. at 2838.) Pharmadyne maintained that the relevant sections of *Lachman* are found at pp. 673–74, which read as follows:

### Influence of pH on Degradation

The magnitude of the rate of hydrolytic reactions catalyzed by hydrogen and hydroxyl ions can vary considerably with pH. Hydrogen ion catalysis predominates at the lower pH range, whereas hydroxyl ion catalysis operates at the higher pH range. At the intermediate pH range, the rate can be pH independent or catalyzed by both hydrogen and hydroxyl ions. The rate constants in this pH range are, however, generally less than those at higher or lower pH values. To determine the influence of pH on the degradation reaction, the decomposition is measured at several hydrogen ion concentrations. The pH of optimum stability can be determined by the plotting of the logarithm of the rate constant vs. pH as illustrated by the pH profile in Figure 23–6. The point of inflection of such a plot represents the pH of optimum stability.

(DX–107; Carstensen Tr. at 2833–40.)

*Fig. 23-6.* pH *inflection plot of maximum stability.*

Dr. Carstensen testified that this particular section of *Lachman* would have taught the ordinary formulator to conduct a pH profile on ranitidine hydrochloride to find the point of optimum stability. (Carstensen Tr. at 2837–40.)

After carefully considering the divergent testimony from Drs. Carstensen and Wray, I find that the '614 and '819 patents are not prior art. Dr. Carstensen testified that ranitidine hydrochloride is not in the category of the compounds covered by the patents. (Carstensen Tr. at 3630–23.) In fact, both Drs. Carstensen and Wray testified that a person of ordinary skill in the art would not have unearthed these two patents in a search for prior art related to ranitidine hydrochloride. (Carstensen Tr. at 3860–61; Wray Tr. at 4824–25.) Although I believe that the two patents teach that pH must be adjusted in certain pharmaceutical formulations to achieve optimum stability, I find that they are not prior art. Taking into account the fact that the patents cover compounds different from ranitidine hydrochloride and the

testimony of Drs. Carstensen and Wray, I do not believe that the ordinary formulator, someone with less skill and knowledge than Drs. Carstensen and Wray, would have consulted these particular patents. *See L.D. Schreiber Cheese Co., Inc. v. Clearfield Cheese Co., Inc.,* 540 F.Supp. 1128, 1134–35 (W.D.Pa.1982) (defining prior art as that "which one of ordinary skill in the art would reasonably be expected to look to for a solution to the problem which the patented article solves"), *aff'd,* 716 F.2d 891 (3rd Cir. 1983). The remaining references, however, are prior art.

The parties agree and I find that the '658 and '431 patents and the "Padfield Article" disclose the use of ranitidine hydrochloride in aqueous pharmaceutical formulations. Moreover, it is undisputed that the '658 patent and the "Padfield Article" teach away from the pH range claimed in the '790 patent. The '658 patent teaches that aqueous-based ranitidine hydrochloride injectables and syrup solutions must be adjusted to a pH of 5.0.

The "Padfield Article" discloses that aqueous formulations of ranitidine hydrochloride are most stable at its natural pH of 5.5. The 431 patent is silent as to pH.

### i. Differences

Pharmadyne contends that the patents and "Padfield Article" references in combination with the *Lachman* and *Remington's* references would have motivated an ordinary formulator, developing a ranitidine hydrochloride aqueous product, to perform a pH profile on the compound to determine the pH of its optimum stability. Having done this, Pharmadyne contends that the ordinary formulator would not have been surprised to discover that the optimum stability of ranitidine hydrochloride is reached within the pH range of 6.5–7.5. Pharmadyne suggests that pH profiles are conducted as a matter of course in pharmaceutical formulation development.

While *Lachman* and *Remington's* teach the use and benefits of pH profiles in pharmaceutical formulation development, I simply am not convinced that Pharmadyne's argument that pH profiles are conducted in every instance of formulation development, is correct. Pharmadyne's contention is not supported by the evidenced presented at trial. Nor am I convinced that the ordinary formulator confronted with the disclosures in the art references would have conducted a pH profile prior to discovering the invention claimed in the '790 patent.

Pharmadyne, however, did elicit from Dr. Carstensen his explanation as to why the ordinary formulator would have performed a pH profile and would have discovered that ranitidine hydrochloride's pH of maximum stability is in the range of 6.5–7.5. Based on his evaluation of Glaxo materials regarding the patents at issue in this case, Dr. Carstensen concluded that ranitidine hydrochloride is an amide and degrades primarily through amide hydrolysis. Based on these assumptions, Dr. Carstensen believed that the pH of optimum stability for a ranitidine solution is around 7.5:

> ... I have a feeling that the way it goes is something like this. It is my feeling that the optimum pH of the ranitidine solution,

without anything else, ... would be somewhere around 7.5. That would be my guess.

\* \* \* \* \* \*

> Well, I cannot say for sure. This is a feeling I get from reading the documents. I obviously cannot say that this is absolutely so. I can only say this is what I have sort of deduced from the documents that I have seen.

(Carstensen Tr. at 2829.) Working under these assumptions, Dr. Carstensen described the reactions that occur during amide hydrolysis and which result in the U/V shaped curve represented in the diagrams from the *Lachman* and *Remington's* texts. Dr. Carstensen testified that at lower pHs $H^+$ reactions occur, while at higher pHs a different reaction involving $OH^-$ reactions occur. (Carstensen Tr. at 3447.) Dr. Carstensen noted that the inflection point on the V-shaped curve or the plateau range in the U-shaped curve, represented the pH at which optimum stability is achieved. (Carstensen Tr. at 3448–51.) Having concluded, although wrongly, that ranitidine hydrochloride is an amide, and having discerned from the *Lachman* and *Remington's* texts that ordinarily the pH profiles of amides exhibit the U/V-shaped curve, Dr. Carstensen believed that the pH profile of ranitidine hydrochloride would produce a similar curve. He theorized that an ordinary formulator would have observed this trend of the amides by reviewing texts, such as *Lachman* and *Remington's* ; would have been motivated to perform a pH profile because the point of maximum stability is easily discernable from the U/V-shaped curve; and would have easily discovered the optimum stability of ranitidine hydrochloride is in the range of 6.5–7.5. (Carstensen Tr. at 3445–3452.)

However, Dr. Carstensen incorrectly identified ranitidine as an amide. On cross-examination Dr. Carstensen recognized his error and acknowledged that it is an enamine. The hydrolysis of an enamine is different from the hydrolysis of an amide. (Carstensen Tr. at 3458–60, 3466; Wray Tr. at 4823.) The undisputed evidence establishes that the average pH profile of an enamine is marked-

ly different from the pH profiles of amides. (Carstensen Tr. at 3457–58.) The pH profiles of enamines ordinarily are flat and reach a plateau in the broad pH range of 2–6. (Carstensen Tr. at 3458; Wray Tr. at 4823–24; PX–421A.) Glaxo presented the following illustration of the pH profiles of various enamines taken from a 1970 art reference:

Figure 1. pH-rate profile for the hydrolysis of several propiophenone enamines at 25°: △, morpholine; ○, dimethylamine; ● piperidine; ◎, pyrrolidine.

Dr. Wray explained that the pH profiles of the enamines represented in the diagram show that the stability of enamines is relatively independent of pH. (Wray Tr. at 4823–24.) He testified that:

The rate which is expressed on the Y axis versus pH is a linear horizontal line, saying that as pH changes, the rate showed no apparent change. Therefore, it's independent of pH.

(Wray Tr. at 4824.) Dr. Wray testified that his conclusion was consistent with the *Lachman* text at p. 673, used by Dr. Carstensen in his prior art discussion: "At the intermediate pH range, the rate can be pH independent or catalyzed by both hydrogen and hydroxyl ions." (Wray Tr. at 4824.)

It is impossible to reconcile Dr. Carstensen's theory of combining the prior art references with his inaccurate classification of ranitidine as an amide. Dr. Carstensen was wrong and Pharmadyne's arguments are unconvincing. In fact, even if the references are combined I am not convinced that the ordinary formulator would have been led to perform a pH profile. The evidence estab-

lishes that the ordinary formulator would not have looked to the amide hydrolysis mechanism disclosed in the *Lachman* and *Remington's* texts. Rather, understanding that ranitidine is an enamine would more likely have looked to enamine hydrolysis which shows a very different relationship of stability versus pH as established by Glaxo's graph. (Carstensen Tr. at 3466; Wray Tr. at 4823–24.) Pharmadyne failed to present evidence demonstrating that the ordinary formulator would have looked outside of Glaxo's instructions in the '658 patent and "Padfield Article" to adjust the pH to around 5.5.

I feel compelled to discount much of Dr. Carstensen's testimony with regard to his theory of combining the *Lachman* and *Remington* references with the Glaxo patents. The premise on which he based his theory of obviousness of the '790 patent was wrong. "Obviousness cannot be established by combining teachings of the prior art to produce the claimed invention, absent some teaching or suggestion supporting the combination. Under section 103, teachings of references

can be combined only if there is some suggestion or incentive to do so." *ACS Hospital Systems, Inc. v. Montefiore Hospital,* 732 F.2d 1572, 1577 (Fed.Cir.1984). Certainly, in this case, there is no suggestion that the prior art references cited be combined.

As is evidenced in the patent prosecution, the patent examiner was well aware that levels of pH are important in development of pharmaceutical formulations. During patent prosecution, the examiner rejected the claims of the '790 patent over the prior art Chemical Abstracts stating, "the pH range notwithstanding" and as being within the skill of the art ... and has not been demonstrated as being critical. (PX–2, p. 26.) It was not until Glaxo submitted the sworn declaration of Dr. John Padfield (the "Padfield Declaration"); a side-by-side comparison of accelerated stability studies performed on two 25 mg/ml ranitidine hydrochloride injection solutions, one buffered to pH 5.5 and one buffered to pH 7.0; and further explanation of why the pH values claimed were critical and not obvious over the prior art, that the examiner allowed the claims.

Pharmadyne not only challenges the pH claims of the patent but the majority of the claims remaining as well. It is unquestionable that the components of the remaining claims being challenged were known in the prior art. I, however, must look at the invention as a whole. " 'A patentable invention, within the ambit of 35 U.S.C.A. § 103, may result even if the inventor has, in effect, merely combined features, old in the art, for their known purposes, without producing anything beyond the results inherent in their use.' " *In re McLaughlin,* 58 C.C.P.A. 1310, 443 F.2d 1392, 1395–96 (C.C.P.A.1971). Pharmadyne's presentation of evidence falls far short of the clear and convincing standard.[28]

28. On July 31, 1998, District Judge Gwin of the United States District Court for the Northern District of Ohio issued an opinion following a non-jury trial in *Glaxo Wellcome, Inc. v. Ben Venue Laboratories, Inc.,* Case No. 1:96–CV–00278. In that case, the defendant undertook to prove the invalidity of the '790 patent. The opinion reflects that the '658 patent and the "Padfield Article" were evaluated as prior art. It is not evident that other prior art references were considered. I have given due consideration to

#### c. '249 Prior Art

Pharmadyne had the burden of persuasion because it was the party asserting invalidity of the '249 patent. *Id.* In its post-trial memorandum, Pharmadyne contends that it made out a *prima facie* case of obviousness and that Glaxo failed to rebut the obviousness by showing evidence of secondary considerations. (Defs.' Post–Trial Mem. at 22.) Pharmadyne contends that it proved its case by establishing that the prior art taught the use of ethanol as a preservative in aqueous pharmaceutical products, and that once Glaxo used ethanol as a preservative against *pseudomonas cepacia,* Glaxo's discovery that ethanol also enhanced the stability of ranitidine hydrochloride was not a surprising result but an expected result. Pharmadyne further contends that Glaxo's use of ethanol as a stability enhancer is not patentable because Glaxo cannot claim a new use for an old composition. (*Id.* at 16.) I find, however, that Pharmadyne failed to carry its burden of establishing by clear and convincing evidence that the prior art taught or suggested the combination of ranitidine hydrochloride and ethanol wherein the ethanol acts as a stabilizer.

Glaxo's '658 and '431 patents are prior art for their teaching of syrup formulations of ranitidine hydrochloride. Pharmadyne relied on *Lachman* and the Physicians Desk Reference/Tagamet ("PDR") for their teaching of utilizing ethanol as a preservative in pharmaceutical syrups.

As noted previously, the '658 patent is the basic ranitidine patent for Form 1. The '658 patent discloses that ranitidine can be formulated into an aqueous solution. The pertinent sections cited by Pharmadyne are the following:

the court's decision in that case for the purpose of evaluating the obviousness issue here. *See Stevenson v. Sears Roebuck & Co.,* 713 F.2d 705, 711 (Fed.Cir.1983) ("[A] prior holding of 'validity' should be given weight in a subsequent suit on the issue of 'validity.' "); *see also Gillette Co. v. S.C. Johnson & Son, Inc.,* 919 F.2d 720, 723 (Fed.Cir.1990); *Shelcore Inc. v. Durham Industries, Inc.,* 745 F.2d 621, 627 n. 10 (Fed.Cir. 1984).

The composition may also take the form of a dragee or may be in syrup form. (DX–39, col. 4, lines 13–15); and

a formula for making a ranitidine syrup, (Tr. at 3440; DX–39, col. 29.),

| (d) Oral Syrup | | % w/v |
|---|---|---|
| Active ingredient | | 2.0 |
| Dilute hydrochloric acid BP, as required | | |
| Sorbitol Solution BPC | | 60 v/v |
| Flavour | as required | |
| Distilled water | to | 100 |

The relevant part of the '431 patent as cited by Pharmadyne references a syrup formulation of ranitidine hydrochloride:

*The '431 Patent*

For oral administration, the pharmaceutical composition may take the form of for example, tablets, capsules, powders, solutions, syrups, or suspensions prepared by conventional means with acceptable excipients.

(DX–40, col. 2–3, lines 66–68.)

Lachman references the use of ethanol as a preservative in aqueous pharmaceutical formulations:

This can be done either by incorporating sufficient concentration of preservative, so that a diluted sample of the product resists microorganism growth, or by including approximately 5 to 10 per cent ethanol in the formulation.

Lachman, p. 451. (DX–79.)

The Physicians Desk Reference entry for Tagamet is prior art but to a limited extent only. Tagamet is similar to the '249 patent in two respects. It contains an $H_2$-antagonist drug, cimetidine, and is used to treat ulcer-type ailments. Dr. Long testified that he used Tagamet as a gauge for knowing whether ethanol could be used in a formulation that would be used to treat ulcer-type ailments.

### i. Differences

None of the references, either alone or in combination, would have disclosed or suggested to an ordinary formulator the use of ethanol as a stabilizer in a ranitidine hydrochloride formulation. At most, the prior art references, in combination, teach the use of ethanol as a preservative in pharmaceutical syrups and other types of aqueous pharmaceutical formulations. Although Tagamet possibly is the closest prior art reference presented here, the PDR reference is prior art only to the extent that it teaches the use of ethanol in aqueous formulations containing $H_2$-antagonist drugs. The limitation exists because Pharmadyne has presented no evidence indicating why ethanol is in Tagamet, or of its effect on the active ingredient, cimetidine. In fact, there are marked differences between the '249 patent and Tagamet. Cimetidine and ranitidine are from two different families of compounds. Cimetidine is a guanidine.[29] Ranitidine is an enamine. Dr. Wray testified that the two chemical compounds are chemically different because they have different ring structures in addition to differences in their side chains. (Wray Tr. at 4812–13.) Furthermore, cimetidine causes side-effects in patients that are not presented by patients taking a ranitidine product. Presumptively, this is due at least in part to the chemical differences between the two compounds. In the absence of evidence showing similarities between the two compounds, I cannot conclude that the '249 patent would have been obvious from the PDR reference alone, or in combination with any of the other references. *See In re Shetty*, 566 F.2d 81, 86 (C.C.P.A.1977) ("Confronted with PTO evidence of obviousness, appellant has offered no evidence of unobviousness, as by showing an actual difference in properties between his compounds and the prior art compounds.... Presented with such an absence of comparative or other evidence with respect to the properties of the compounds and the claimed composition, we hold that composition claim 52 would have been obvious from and unpatentable over the prior art.").

Dr. Carstensen testified that once Glaxo chose to use ethanol as a preservative it was inevitable that Glaxo would have discovered that ethanol increased stability. Dr. Carstensen testified that after Glaxo added ethanol to its formulation the FDA required

---

**29.** Dr. Carstensen testified that cimetidine and ranitidine are similar because they are H2 antagonists and contain sulfur. He believed that both were amides. (Carstensen Tr. at 2445.)

Glaxo to conduct stability test studies prior to it issuing any approval to market the ranitidine/ethanol formulation. (Carstensen Tr. at 2450.) Dr. Carstensen testified that an ordinary formulator would have known of the FDA's policy and would have wanted to check stability anyway because the degradation mechanism of ranitidine hydrochloride would have indicated to the ordinary formulator that the formulation may be unstable. (Carstensen Tr. at 2452–54.)

The test for obviousness in this case is not whether an ordinary formulator would have discovered the invention while conducting stability tests to obtain FDA approval. To find obviousness, I must be able to conclude from the prior art that the ordinary formulator would not only try to combine ethanol and ranitidine hydrochloride, but also that the prior art would sufficiently teach or direct the ordinary formulator how to obtain the stabilizing result. *U.S. Surgical Corp. v. Ethicon, Inc.* 103 F.3d 1554, 1564 (Fed.Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997). A court determines obviousness by evaluating whether the prior art teaches or suggests the claimed invention.

Pharmadyne contends, for the first time post-trial, that dependent claims 4–10 of the '249 patent are invalid as being obvious over the prior art '790 patent and its corresponding British patent application. Pharmadyne also asserts that various elements of the dependent claims are also shown in the prior art '658 patent.

Although it is clear that the '790 patent and the British patent application are prior art, Pharmadyne has failed to present any evidence to the court to rebut the presumption of validity as it relates to these two prior art references. At trial, Pharmadyne failed to develop any argument or testimony regarding these particular art references. Moreover, discussion regarding these prior art references is absent from Pharmadyne's pleadings, proposed findings of fact and conclusions of law, the pre-trial order, and stipulations of fact. The only mention of these two references in relationship to the '249 patent is found in a cursory comparison of the references and the dependent claims in Pharmadyne's post trial memorandum.

Pharmadyne did not present any prior art more relevant than that reviewed by the PTO. The PTO reviewed pertinent sections of the British patent application. In point of law, Pharmadyne cannot establish an obviousness defense simply by showing that specific elements claimed in the prior art references existed at the time the invention was made. Instead, Pharmadyne must show that Glaxo's invention as a whole would have been obvious to one of ordinary skill in the art. *See Jones v. Hardy,* 727 F.2d 1524, 1528 (Fed.Cir.1984). The '790 patent and British patent application, alone or in combination with the other prior art references, do not disclose or suggest the use of ethanol to enhance the stability of ranitidine in the pharmaceutical formulation they claim. The invention claimed in the '249 patent presents a new and improved element combined with the old elements found in these two prior art references. Clearly, Pharmadyne has not carried its burden.

Finally, Pharmadyne argues that because the prior art taught the use of ethanol as a preservative in pharmaceutical syrup formulations, Glaxo cannot now be said to own a patent on that combination on the basis that it discovered a new use for the old combination. In support thereof, Pharmadyne cites: *In re Schreiber,* 128 F.3d 1473 (Fed.Cir. 1997); *In re Woodruff,* 919 F.2d 1575 (Fed. Cir.1990); *Verdegaal Bros., Inc. v. Union Oil Co.,* 814 F.2d 628 (Fed.Cir.), *cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987); *In re Zierden,* 56 C.C.P.A. 1223, 411 F.2d 1325 (C.C.P.A.1969); *In re Sinex,* 50 C.C.P.A. 1004, 309 F.2d 488 (C.C.P.A.1962), *reh'g granted in part,* 50 C.C.P.A. 1003, 315 F.2d 381 (C.C.P.A.1963); and *In re Neugebauer,* 51 C.C.P.A. 1138, 330 F.2d 353 (C.C.P.A.1964). Although none of these cases seem in point, they do support Pharmadyne's contention that discovery of a new use for an old composition does not make a claim to the old composition patentable. However, in the particular cases cited, with the exception of *Zierden,* the new use was encompassed or disclosed in the prior art. In *Zierden,* the new use was not disclosed or suggested in the prior art and the patent allowance was affirmed.

Claim 1 of the '249 patent is clearly not encompassed in the prior art cited by Pharmadyne. The newly disclosed benefit of ethanol enhancing the stability of ranitidine hydrochloride in the aqueous formulation is a substantial difference from the prior art. The prior art cited does not teach or suggest using ethanol as a stability enhancer in pharmaceutical formulations. Indeed, the experts testified that once Dr. Long added ethanol to the formulation stability could have increased, decreased, or stayed the same.

### d. Secondary Considerations

Pharmadyne asserts that Glaxo failed to present evidence establishing that the '790 and '249 patents contributed to the phenomenal commercial success of Glaxo's Zantac products. The record reflects otherwise.

Although there is no direct evidence establishing that Glaxo's Zantac product is being purchased because of the qualities attributed to the inventions claimed in the '790 and '249 patents, there is evidence demonstrating that the sale of the injectable and syrup products that are based on the patents have been commercially successful. In part, their commercial success presumptively is related to the extended shelf-life Glaxo has achieved through its patents. Revenues flowing from the sale of pharmaceutical products that were developed from the '790 and '249 patents have allowed Glaxo to grow tremendously over a relatively short period of time. When Glaxo scientists engineered the ranitidine compound, Glaxo was a small concern. Over the past decade, Glaxo has grown into one of the largest pharmaceutical concerns in the world primarily due to the sale of its Zantac products. Between 1983 and 1996, the cumulative number of prescriptions for Zantac products in the United States grew to over 100 million. It is estimated that worldwide prescriptions for Zantac products topped 300 million patient treatments. (Wood Tr. at 203–04.) On June 17, 1991, *Barron's* proclaimed: "As a result of the development of the ulcer drug Zantac, the UK's Glaxo Holdings PLC was transformed from a medium-sized health care conglomerate to a focused, fast growing pharmaceutical giant." (PX–277.)

In 1989, when Zantac syrup was introduced into the market, Glaxo's revenues were less than $20 million. Within three years its revenues had reached $60 million and topped nearly $80 million in 1994. In comparison, revenues from the sale of Tagamet and Pepcid syrups, Zantac's closest competitors, remained below $20 million for the same period. Pepcid syrup crossed over the $20 million mark in 1994, 1995, and 1996, but even at its peak in 1996, revenues from the sale of Pepcid syrup were capped at a little less than $40 million. In 1989, Zantac syrup held 31% of the market share while Tagamet held 65%. By 1990, Zantac syrup had control over 50% of the market. During the period 1990–1993, Zantac garnered 50% of the market share with its syrup formulation. Zantac syrup dominated its competitors with 63% and 65% market shares in 1992 and 1993. Even when Zantac syrup's market share dropped below 48% in 1996, Zantac syrup still dominated the market. Recent, leveling off of revenues and market share has been attributable to competition in the market. (PX–267.)

Glaxo's Zantac injectable product has been equally successful. During its peak years from 1988–1992, the Zantac injectable product controlled the market with figures ranging from 69–79% of the market share. (PX–268.) By 1989, its revenues had exceeded $80 million. (PX–268.). Tagamet and Pepcid injectables lagged behind in revenues and market share. (PX–268.)

### e. Ordinary Skill in the Art

Glaxo correctly notes that Pharmadyne failed to develop evidence of the level of ordinary skill in the art at the invention dates for both the '790 and '249 patents. Nevertheless, I find that the prior art and testimony elicited from the experts and other key witnesses on the subject of the patents sufficiently establishes the level of ordinary skill in the art for both the '790 and '249 patents.

In some cases, the absence of evidence of the level of skill in the art results

in the failure of the challenging party's ability to satisfy the burden of establishing obviousness. *See E.I. DuPont De Nemours and Co. v. Monsanto Co.*, 903 F.Supp. 680, 714 (D.Del.1995), *aff'd*, 92 F.3d 1208 (Fed.Cir. 1996). Ordinarily, the level of skill in the art is established through the testimony of experts familiar with the art and the patent at issue. *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 205 (7th Cir.1982). Some courts have held that expert testimony on the level of skill is unnecessary because the prior art itself reflects the level of skill. *Markman v. Lehman*, 987 F.Supp. at 36 (D.D.C.1997). The level of ordinary skill in the art is a factual question. *Chore–Time Equipment, Inc. v. Cumberland Corp.*, 713 F.2d 774, 779, n. 2 (Fed.Cir.1983) ("We hold only that an invention may be held to have been either obvious (or nonobvious) without a specific finding of a particular level of skill or the reception of expert testimony on the level of skill where, as here, the prior art itself reflects an appropriate level and need for such expert testimony has not been shown."); *Joy Technologies, Inc. v. Quigg*, 732 F.Supp. 227, 237 (D.D.C.1990) ("[T]he subject matter of the patent at issue is technically complex. However, the claim elements are recited in general terms (e.g. conversion means), and the particular electrical circuitry is not claimed. Therefore, the references cited can be used to reflect the appropriate level of skill in the art.")

Factors that may be considered in determining the level of ordinary skill in the art include: 1) type of problems encountered in the art; 2) prior art solutions to those problems; 3) rapidity with which innovations are made; 4) sophistication of the technology; and 5) educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed.Cir.1986) (*citing Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 697 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984)) ("The important consideration lies in the need to adhere to the statute, i.e., to hold that an invention would or would not have been obvious, as a whole, when it was made, to a person of "ordinary skill in the art"—not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand."). "In a given case, every factor may not be present, and one or more factors may predominate." *In re GPAC*, 57 F.3d at 1579 (*citing Custom Accessories, Inc. v. Jeffrey–Allan Indust., Inc.*, 807 F.2d at 962–63.)

The issues in this case involve the development of an oral syrup and injectable solutions containing the active ingredient, ranitidine hydrochloride. The prior art being explored in the case are patents related to ranitidine hydrochloride and excerpts from textbooks used in the pharmaceutical industry and in colleges and universities to train future formulators. During the course of Drs. Carstensen and Wray's evaluation of the prior art, they spoke in terms of what the "ordinary formulator" would have unearthed in a search for prior art and would have been taught from that art. (Carstensen Tr. at 2449–2455, 3860–62, 3869–70, 3874; Wray Tr. at 4806, 4822, 4824–25.)[30] On the basis of this information, the level of skill in the art should be measured in terms of a formulator possessing the skills of a formulator on a level between Drs. Pathak and Gullapalli.

The ordinary formulator referred to by Drs. Carstensen and Wray is not an artisan possessing their level of skill and expertise; nor that of Dr. David Long. Drs. Carstensen, Wray, and Long have extensive experience and possess vast knowledge in the areas of chemistry, pharmaceutical development and processing, and the patenting of pharmaceutical products. Dr. Pathak, on the other hand, had recently obtained a Ph.D. in Industrial Pharmacy in 1995 when he began working for UDL and undertook the evaluation of Dr. Gullapalli's work on the accused product. Prior to that he had earned a master's degree in the same subject. (PX–370, p. 9.) Dr. Gullapalli became employed with UDL in 1993. It was his first professional employment in the United States. Dr.

---

30. Dr. Wray mentioned that during his undergraduate studies he was forced to carry around *Remington's* for four months as penance.

Gullapalli has a Bachelor's and Master's degree in Pharmacy. He earned his Ph.D. in Pharmaceutical Sciences in 1993. (PX–369, p. 10) The ordinary formulator possesses similar academic credentials and sufficient knowledge and experience in the areas of chemistry and pharmaceutical development to perform routine explorations and develop pharmaceutical formulations.

## 2. Inequitable Conduct

■■■■ "Inequitable conduct is the failure to disclose material information, or the submission of false material information during prosecution of a patent with an intent to deceive." *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1580 (Fed. Cir.1997) (citations omitted). A patent applicant has a duty to call to the attention of the PTO all non-cumulative information which a reasonable patent examiner would consider pertinent when reviewing patentability of the patent claims being pursued. If the applicant willfully violates this obligation by commission or omission, her patent is unenforceable. *Precision Instrument Mfg. Co. v. Automotive Maintenance & Mach. Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

■■■■ Pharmadyne seeks to have the '790 and '249 patents adjudged unenforceable. To that end, Pharmadyne set out to prove that Glaxo entered into this lawsuit with "unclean hands." Pharmadyne maintains that Glaxo engaged in a broad pattern of misconduct before the PTO. Pharmadyne argues that the scheme began during the prosecution of the '431 patent and continued through the prosecution of the '249 patent. Glaxo's goal, Pharmadyne says, was to protect its multi-billion dollar patent monopoly beyond the expiration of its basic ranitidine patent. Pharmadyne maintains that the true nature of Glaxo's trickery can only be fully appreciated by viewing Glaxo's actions in prosecuting the '431, '790, and '249 patents as a whole; only then will the court be able to recognize the crafty deception Glaxo played out on the PTO. Pharmadyne contends that where there is a pattern of deceptive conduct in prosecuting related patents, fraud with

respect to any one of them invalidates the others.

More specifically, Pharmadyne asserts that the '790 patent is unenforceable because: 1) the patent application is misleading; 2) Glaxo failed to provide a copy of the "Padfield Article" to the patent examiner; 3) the "Padfield Article" is misleading; and 4) the "Padfield Declaration" is misleading. Regarding the '249 patent, Pharmadyne asserts that Glaxo: 1) failed to tell the patent examiner that Tagamet contains ethanol; and 2) omitted and misrepresented data in the Hempenstall Declaration.

■■■■ Pharmadyne had the burden of establishing by clear and convincing evidence: 1) the materiality of any misstatements and/or omissions; and 2) that the misstatements and/or omissions were intentionally made with the specific intent to deceive. Materiality is measured in terms of 'whether there is a substantial likelihood that a reasonable examiner would consider the omission or misrepresentation important in deciding whether to issue the patent.' *Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 803 (Fed.Cir.1990) (*citing J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). Furthermore, an "[i]ntent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed.Cir.1996) (*citing Braun Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 822 (Fed.Cir.1992)). "To satisfy the intent to deceive element of inequitable conduct, 'the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.' " *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 1189 (Fed.Cir.1993). As intent rarely can be proven by direct evidence, "[i]t is most often proven by 'a showing of acts the natural consequences of which are presumably intended by the actor.' " *Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed.Cir.1989) (*quoting Kansas*

*Jack,* 719 F.2d at 1151). The court's role is to balance materiality and intent to determine, "whether the scales tilt to a conclusion that inequitable conduct occurred." *J.P. Stevens,* 747 F.2d at 1560; *Critikon,* 120 F.3d at 1256.

Although I allowed Pharmadyne to present evidence on the alleged misconduct of Glaxo in prosecuting the '431 patent to prove that Glaxo schemed to control the ranitidine market, I am not persuaded that Glaxo had a grand scheme of inequitable conduct in the acquisition of the Zantac patents. Not only did Pharmadyne fail to establish inequitable conduct by Glaxo scientists, David Collin and Dr. John Hunt, who, it alleges, began the charade by submitting misleading declarations to the PTO during prosecution of the '431 patent, but it also failed to establish inequitable conduct by Glaxo in prosecuting the '790 and '249 patents.

a. Misconduct in Prosecuting the '431 Patent

First, Pharmadyne contends that Mr. Collin mislead the patent examiner when he failed to disclose that both Form 1 and Form 2 ranitidine hydrochloride could be produced by using concentrated aqueous hydrochloric acid. It is undisputed that hydrochloric acid can produce both forms of ranitidine hydrochloride. During patent prosecution, the examiner required a demonstration that Form 2 ranitidine hydrochloride was different from and had advantages over the product of Example 32 of the prior art '658 patent. In response, Mr. Collin stated in his declaration that in his opinion, Form 2 has better filtration and drying characteristics than Form 1 and that the use of concentrated aqueous hydrochloric acid to make Form 2 was surprising given ranitidine hydrochloride's high solubility in water. He also noted the advantages of using hydrochloric acid over the corrosive hydrogen chloride gas in the prior art process.

The evidence fails to show clearly and convincingly that disclosure that Form 1 could be made from hydrochloric acid during patent prosecution would have had a signifi-

cant impact on the examiner's decision. Mr. Collin's declaration responded to the examiner's specific request to compare the prior art with Form 2. The prior art discloses the ability to use hydrogen chloride gas to make ranitidine hydrochloride; the '431 patent discloses the use of hydrochloric acid to make Form 2. It has been demonstrated that the difference was significant. The ease of use of hydrochloric acid was an improvement over the use of hydrogen chloride gas. Moreover, there is no evidence indicating Mr. Collin's representation that Form 2 ranitidine had more advantageous filtration and drying characteristics than Form 1, was inaccurate. Pharmadyne asserts that a file memorandum prepared by Glaxo's counsel, Mr. Marchant, demonstrates that Glaxo and Mr. Collin knew there were no advantages of Form 2 to justify a patent because there was no data demonstrating filtration problems with Form 1, no demand for an improved product, and nothing new or novel about being able to make Form 2 from hydrochloric acid. I see nothing in Mr. Marchant's memorandum that directly contradicts statements made by Mr. Collin in his declaration. I have not been presented with evidence that Mr. Collin or Glaxo acted improperly.

Pharmadyne also charges that Dr. Hunt's declaration contained false statements that were material to the prosecution of the '431 patent. However, Pharmadyne never developed substantial evidence to support the charge. Pharmadyne relies primarily on the court's decision in *Glaxo, Inc. v. Novopharm Ltd.,* 830 F.Supp. at 877–78, in which Judge Boyle found that Dr. Hunt's declaration contained misstatements that were misleading.[31] Judge Boyle stated:

There is no doubt that the Hunt declaration is misleading. The declaration represents that Exhibit JHH1 was prepared from an Example 32 sample. It was not appropriate to submit a spectrum prepared from a sample of any other process. The declaration also represents that "the product of Example 32" was subjected to x-ray powder diffraction, and this was in fact not true ... Turning first to materiality, the

---

31. Judge Boyle also examined the issue of the inequitable conduct of Mr. Collin. He concluded

that Mr. Collin did not misrepresent the facts in his declaration.

court finds the misstatements were material. The patent examiner asked specifically for data showing the differences between the product of Example 32 and Form 2. The Hunt declaration purported to address that concern directly, but it did not.

*Id.* at 878. However, Judge Boyle also found that the evidence did not support the inference that Dr. Hunt and Glaxo intended to deceive the patent examiner. *Id.* at 879. Glaxo does not controvert Judge Boyle's conclusion that Dr. Hunt's declaration contained misstatements, but here relies on Pharmadyne's failure to present any evidence independent of Judge Boyle's decision, of Dr. Hunt's alleged misconduct. There is simply no evidence of significant import from which I could deduce that Glaxo schemed to deceive the PTO in the prosecution of the '431 patent.

b. Misconduct in Prosecuting the '790 Patent

At trial, Pharmadyne aspired to defeat the enforceability of the '790 patent by establishing that Dr. Padfield and Glaxo deliberately withheld information from and mislead the patent examiner. First, Pharmadyne argues that the patent application was misleading because Glaxo failed to inform the PTO that buffer concentration affects the stability of aqueous formulations and that the claimed pH range of 6.5–7.5 was not universal to all formulations. Pharmadyne makes a similar argument regarding information contained in Dr. Padfield's declaration.

i. *Buffer Concentration*

Dr. Carstensen testified that Dr. Padfield's comparison of a pH 5.5 formulation with a pH 7 formulation in the "Padfield Declaration" was misleading because Glaxo "spiked" the pH 5.5 formulation with twice as much buffer as that contained in the pH 7 formulation and did not disclose this to the patent examiner. Dr. Carstensen accused Glaxo of intentionally spiking the pH 5.5 formulation to obtain the favorable stability data it needed to overcome the examiner's obviousness rejections. Dr. Carstensen also testified that

the comparison figures were significant given the fact that the examiner specifically asked for a side-by-side comparison to show the stability improvement achieved by a higher pH formulation. (Carstensen Tr. at 3229–50.)

Pharmadyne's accusations are baseless. Pharmadyne did not produce any evidence of significant probative value to support its contention that buffer concentration affects the stability of ranitidine hydrochloride aqueous solutions.[32] When Pharmadyne's counsel asked Dr. Carstensen whether Dr. Padfield's comparison of the pH 5.5 and pH 7 formulations in his declaration was appropriate, he responded:

I would not have done it this way. I mean, if I wanted to see what it was under comparable conditions at 5.5 and 7.0, I would have kept the two buffer concentrations the same. I would have upped the buffer concentration in 7.0 so that I could compare it with the one at 5.5. If I had done it that way, it would have been a fair comparison.

(Carstensen Tr. at 3232–33.) And, when Glaxo's counsel questioned Dr. Carstensen on whether buffer concentration affected stability, his responses included the following:

Q: And your testimony began with a frank acknowledgment that there was nothing in the art that said that for a particular compound the art knew that it will go up, the stability would go up if you increased concentration, that it would go down or stay the same?

C: My testimony was it could go either way, there was a buffer effect in general.

Q: Or might stay the same?

C: That's correct.

Q: You had done no testing to determine for anything involved in our litigation what the effect of an increased concentration of buffers would do; that is also so, is it not?

---

32. On the issue of infringement, I discussed fully my reasons for not embracing Pharmadyne's assertion that increased buffer concentration negatively impacts on the stability of ranitidine hydrochloride aqueous formulations. *See* pp. 49–52, *supra.*

C: I have not done any personal testing no.

(Carstensen Tr. at 3810–11.)

Although it was not essential that Dr. Carstensen carry out an experiment to show that increased buffer concentrations impact negatively on the stability of ranitidine hydrochloride, it was critical that Pharmadyne produce evidence indicating this to be true. Pharmadyne failed to do that and it would be inappropriate, to say the least, to base a finding of inequitable conduct on such conclusory and equivocal testimony even when it is elicited from an expert of Dr. Carstensen's caliber. Pharmadyne relied heavily on the buffer concentration theory, but never produced evidence that convincingly established this point. Having failed to establish a connection between buffer concentration and the stability of aqueous formulations of ranitidine hydrochloride, Pharmadyne has failed to establish materiality.

In any event, Dr. Padfield's testimony on this issue was credible and convincing. He testified that the data submitted in his declaration comparing the pH 5.5 and pH 7 formulations had been previously constructed several years prior to the examiner's request for a side-by-side comparison and at a time when Glaxo was unaware of the invention claimed in the '790 patent. He testified further that "if we had constructed something to deceive the Patent Office, we would have had to have done it a long time before we realized there was a novel invention." (Padfield Tr. at 4469.) Dr. Padfield testified that all of the statements he made in his declaration were based on the "thousands of man-hours of work" that went into developing and evaluating the pH formulation. He was certain that the data demonstrated unequivocally that aqueous formulations of ranitidine hydrochloride are more stable at the claimed pH range. (Padfield Tr. at 4469–4472.) Dr. Padfield did not believe that buffer concentration affected the stability of ranitidine. (Padfield Tr. at 4449–50.) It never occurred to him to conduct a study on the relationship between stability and buffer concentration. Although, Drs. Wray and Carstensen agree that buffer concentration may affect stability of a drug product in aqueous formulations, I

have seen no evidence that indicates this to be true in this case.

### ii. The Padfield Article

Pharmadyne alleges three specific instances of inequitable conduct by Glaxo with regard to the prior art, "Padfield Article." First, Pharmadyne contends that Glaxo failed to submit the "Padfield Article" to the PTO. By stipulation, the parties agree that the file history of the '790 patent does not reflect that Glaxo sent to the PTO, a copy of the "Padfield Article." Regardless, the record clearly reflects that Glaxo fulfilled its duty to disclose relevant prior art to the PTO. Glaxo informed the patent examiner of the "Padfield Article" and of its contents. Glaxo referred to the article in the patent specification and in subsequent submissions to the PTO: an amendment and the "Padfield Declaration." Furthermore, the file history indicates that Glaxo relied on the teachings of the article to formulate at pH 5.5, to overcome the obviousness rejections of patent examiner. In fact, Dr. Padfield insisted in his declaration that he believed the "Padfield Article" was more pertinent prior art than the Chemical Abstracts relied on by the patent examiner.

Second, Pharmadyne contends that the article was misleading because it did not contain data to support the conclusion that a simple solution of ranitidine hydrochloride is most stable at its "natural pH of 5.5." Dr. Carstensen testified that "a simple solution has an optimum pH of somewhat over 7." (Carstensen Tr. at 3279.) There has been no evidence produced that convinces me that Glaxo's claim that ranitidine hydrochloride is most stable at its "natural pH of 5.5," was incorrect or misrepresented to the examiner and that Glaxo's claims on the stability of the pH 6.5–7.5 formulations have been misstated. Pharmadyne also contends that the article is misleading because Glaxo failed to disclose that it had scientific evidence that some formulations of ranitidine hydrochloride were most stable over the pH range of 4–6.5 and that it had made a formulation that reached optimum stability at pH 6. Glaxo does not dispute that it produced a formulation at pH 6 that showed an increase in stability over

that achieved at pH 5.5. However, it is not clear that disclosure of this information would have been important in the prosecution of the patent.

Curiously, Pharmadyne alleges, in the alternative, that the "Padfield Article" is hearsay, contains conclusory statements unsupported by scientific data and, therefore, has no value in the determination of the obviousness of the invention claimed by the '790 patent. More particularly, Pharmadyne challenges Glaxo's use of the article on the ground that the article does not report scientific data supporting its "natural pH" position. Pharmadyne suggests that Glaxo should not have relied on the article in informing the patent examiner that it was not obvious to change the pH of a ranitidine hydrochloride formulation from its "natural pH" of 5.5 to a pH of 6.5–7.5.

The materiality of this particular alleged omission has not been established by clear and convincing evidence. The article specifically states that "[a]ccelerated pH and temperature stability studies indicated that the [Zantac] injection, [a simple aqueous solution of ranitidine in water], was most stable at its 'natural pH' but its shelf life is dependent upon the storage temperature." (DX–28, pp. 19–20.) It is clear from the record that Glaxo conducted such studies, and there is no evidence refuting Glaxo's "natural pH" claim.

### iii. The Padfield Declaration

Pharmadyne asserts that Glaxo mislead the patent examiner by using only two high temperature points in its side-by side comparison of the pH 5.5 and pH 7 formulations. Dr. Carstensen testified that it was "really very speculative" and that using only two points as opposed to using at least three points, gives one "no idea of what the precision of your prediction is." (Carstensen Tr. at 3265.) He testified further that:

This particular case is a good example. If you had taken only the 70 and 80 degree point, you essentially would have arrived at a predicted point that was much lower than the actual data at 30 and 37 ... If you just take the two points to the left, if you only had those two points and if you drew a line, you would notice that the line would be much steeper. This is one of the reasons that whenever you draw an Arrhenius plotting, you should have at least three points, you just absolutely don't know how accurate your data is.

(Carstensen Tr. at 3265.)

Dr. Carstensen's testimony is unconvincing. Dr. Padfield explained that Glaxo "had previously undertaken studies at those temperatures" and "produced data at lower temperatures [where Glaxo] got a very, very good predicted straight line. So, certainly our previous experience would have suggested to us that 70 to 80 were very good. The second point is that the data we had at 70 to 80 degrees was not just single data point. It was, in fact, data of multiple samples. In fact, the data were very tight.... All of the statistics showed that, in fact, the prediction was highly valid." (Padfield Tr. at 4469–70.) Dr. Padfield then explained how he had arrived at the conclusion that the data he submitted in his declaration was accurate, and I accept his explanation. Additionally, on cross-examination, Dr. Carstensen was asked whether or not Pharmadyne had relied on a similar two temperature point Arrhenius computation in its final report on the accused product. Dr. Carstensen acknowledged this to be true. (Carstensen Tr. at 5065–65.)

Pharmadyne's final assertion of inequitable conduct in prosecuting the '790 patent relates to the data reported in the side-by-side comparison. In his declaration, Dr. Padfield disclosed that three year stability studies on ranitidine injection formulations at pH 6 and pH 7 confirmed the predictions of the side-by-side comparison. Dr. Padfield specifically stated:

Thus, on the basis of the above calculations a significant increase in shelf life can be achieved if one adjusts the pH of a 25 mg/ml ranitidine injection at normal storage temperatures from 5.5 to 7.0. Long term (three year) stability studies on 25 mg/ml ranitidine injections at pH 6 and 7 and at 20Č and 30Č have confirmed these predictions of an extended shelf life at pH 7.

Dr. Carstensen testified that Dr. Padfield's statement is misleading because it suggests

that the long term stability data confirms the tenfold increase that is predicted by the side-by-side comparison, when in fact the long term data shows only a three fold increase in stability between the pH 6 and pH 7 formulations. Dr. Carstensen also said that the statement is not valid because the side-by-side comparison samples were tested at much higher temperatures than the pH 6 and 7 formulations in the long term studies. (Carstensen Tr. at 3425.) Pharmadyne further contends that Dr. Padfield should have disclosed all of the data from its long term stability studies on the pH 6 and 7 formulations. In its post-trial memorandum, Pharmadyne contends that Glaxo should have submitted the long term stability data to the patent examiner because they were obtained from real time studies and, therefore, are more accurate than the predicted side-by-side comparison data. Pharmadyne contends that had this been done, the patent examiner would have observed that the real time studies showed only a three-fold increase in stability as compared to the tenfold increase predicted by the high temperature studies.

I disagree with Dr. Carstensen and Pharmadyne. The declaration is not misleading. The patent examiner requested a side-by-side comparison of the prior art pH 5.5 formulation and the proposed patent formulation. Dr. Padfield's statement does not suggest that the long term stability data confirms a tenfold increase in stability. Instead, the statement suggests that the data supports Glaxo's claim that a significant increase in shelf-life can be achieved at a pH of 7. Moreover, I do not find that a reasonable patent examiner would have found the pH 6 and pH 7 long term stability data important given that the examiner was evaluating the data against the prior art teaching that ranitidine hydrochloride is most stable at its "natural pH" of 5.5. Even so, Pharmadyne has failed to present evidence from which I can infer that Glaxo obtained the '790 patent by subterfuge. Accordingly, I do not find inequitable conduct by Glaxo or Dr. Padfield in prosecuting the '790 patent.

### c. Misconduct in Prosecuting the '249 Patent

### i. Failure to Disclose the Use of Ethanol in Tagamet

Dr. Carstensen testified that it was scientifically misleading for Glaxo not to have disclosed to the PTO that Tagamet contained approximately 3% ethanol. Dr. Carstensen believed that it was relevant information because Tagamet performs a pharmaceutical function similar to ranitidine and that Dr. Long proceeded to use ethanol in the ranitidine solution because he knew that Tagamet contained ethanol. Notwithstanding Dr. Carstensen's opinion, it is not clear to me that the use of ethanol in Tagamet would have been information material to the prosecution of the '249 patent.

Although both Tagamet and ranitidine hydrochloride are used to treat ulcer-type ailments, there clearly are chemical differences between the two. As I noted previously, Tagamet's active ingredient is cimetidine, not ranitidine hydrochloride. Cimetidine is a guanadine, not an enamine like ranitidine hydrochloride. Based on Dr. Bernstein's testimony explaining that chemical compounds in the same family or group usually react similarly, and the fact that cimetidine and ranitidine hydrochloride are not the same type of compound, it is difficult to see the connection between the Tagamet reference and the claims of the '249 patent. Pharmadyne has produced little evidence establishing a nexus between the two other than the fact that they are $H_2$-antagonist drugs. Accordingly, materiality has not been demonstrated. *See Merck & Co., Inc. v. Danbury Pharmacal, Inc.,* 873 F.2d at 1421 (prior art of a drug product shown to have activity comparable to the drug product claimed in the patent was material).

Even if Pharmadyne had otherwise established the materiality of the Tagamet reference, the reference is cumulative and, therefore, not material. *See J.P. Stevens,* 747 F.2d at 1560 ("Under the standard, a reference that would have been merely cumulative is not material.") (*citing Kimberly–Clark Corp.,* 745 F.2d at 1455–56); *see also Gambro Lundia AB v. Baxter Healthcare Corp.,* 110 F.3d at 1580 ("A reference which merely

replicates references already before the examiner, however, is not material."); *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1534 (Fed.Cir.1991) ("when a reference is cumulative to other prior art that was before the examiner, the element of materiality is not established and inequitable conduct can not lie"). The patent examiner rejected the '249 patent application numerous times on the ground that the prior art taught the cojoining of ethanol and ranitidine. And, when Glaxo requested reconsideration of its application, Glaxo acknowledged that ethanol had previously been used in pharmaceutical compositions as a solvent or preservative against bacterial contamination. Viewed in this light, Pharmadyne has failed to establish the materiality of the Tagamet reference.

### ii. *The Hempenstall Declaration*

Pharmadyne argued at trial that Dr. Hempenstall intentionally withheld and misrepresented stability data in his declaration. Dr. Carstensen testified that Dr. Hempenstall reported only favorable data and should have included all of the data available to him. Dr. Carstensen specifically claimed that Dr. Hempenstall intentionally withheld all of the stability data from the United Kingdom studies and the 20C̃ data from the United States stability studies because that data demonstrated that the non-ethanol formulations had greater stability than the ethanol formulations. Dr. Carstensen also challenged Dr. Hempenstall's inclusion of the 37C̃ data in his declaration, on the basis that the data had not been properly analyzed and, therefore, was unreliable.

Because the prior art taught the cojoining of ranitidine and ethanol, the patent examiner directed Glaxo to demonstrate "by means of experimental data, that [its] invention produces ... unexpected results." (PX–4, p. 82; PX–4A, p. 89.) Dr. Hempenstall provided the supporting data in a declaration filed with the PTO. Before Dr. Hempenstall prepared his declaration he asked for statistical analyses of the comparative studies that Glaxo had conducted on ethanol and non-ethanol solutions in the United States and the United Kingdom, partly because his predecessor, Dr. Fiona Byrd, had questioned whether the ethanol stability effect was significant. (Hempenstall Tr. at 4245–47; DX–34, pp. Y009643–44.) Nadeem Elahi, an employee in Glaxo's Statistics Division, evaluated the three year stability studies and it was this data that Dr. Hempenstall used to prepare his declaration. (Stipulation 82.) In pertinent part, the declaration recites:

Stability studies were carried out comparing this formulation with a formulation that was identical except that it did not contain ethanol. Samples of each formulation were stored at 30C̃, 37C̃, and 45C̃ for approximately 3 years and the ranitidine content measured by high performance liquid chromatography (h.p.l.c.) against a standard, which was the corresponding formulations stored at 4C̃. At each temperature 2 samples of the formulation without ethanol, identified as Batches 1 and 2 were analyzed along with 3 samples of the formulation with ethanol identified as Batches 3, 4, and 5. . . .

\* \* \* \* \* \*

... Accordingly, the figure determined from the stability studies was the time (in months) for 5% ranitidine loss calculated as the lower 95% confidence limit. The results are as follows:

| Temperature | Without Ethanol | | With 7.5% Ethanol | | |
| | Batch 1 | Batch 2 | Batch 3 | Batch 4 | Batch 5 |
| --- | --- | --- | --- | --- | --- |
| 30°C | 12.5 | 13.6 | 19.5 | 17.0 | 20.8 |
| 37°C | 5.4 | 4.7 | 7.8 | 7.1 | 7.5 |
| 45°C | 1.8 | 2.3 | 2.9 | 2.9 | 2.8 |

Thus the formulation with ethanol has an average shelf life at 30C̄ of 19 months compared with 13 months when ethanol is excluded from the formulation. This is a highly significant and valuable improvement.

Dr. Hempenstall also included stability data from studies of oral liquid formulations containing varying amounts of ethanol.

| Temperature | % Ethanol | | | | |
|---|---|---|---|---|---|
| | 0 | 2.5 | 5.0 | 7.5 | 10.0 |
| 37°C | 5.9 | 7.2 | 7.6 | 7.7 | 6.4 |
| 45°C | 2.1 | 2.4 | 2.4 | 2.6 | 2.7 |

In his declaration, Dr. Hempenstall concluded that these results establish that ethanol had a beneficial effect upon stability. (DX–32.)

There is no question that Glaxo should have provided the PTO with all of the experimental data from both the United Kingdom and United States studies. The patent examiner specifically requested that Glaxo support its invention with statistical data. Glaxo, through its counsel's communications with the PTO, was cognizant of the fact that obtaining the '249 patent hinged on its presentation of experimental data to the PTO that supported its invention. Obviously, Dr. Hempenstall's declaration convinced the patent examiner that Glaxo's claims of stability enhancement were accurate; subsequent to the filing of the declaration, the patent examiner allowed the claims of the '249 patent. The patent examiner should have been allowed to review all of the data to determine for himself whether Glaxo's claims were accurate. *See Procter & Gamble Co. v. Kimberly–Clark Corp.*, 740 F.Supp. 1177, 1198 (D.S.C.1989) (The patent examiner should have been allowed to review the tests results to decide for "herself whether the broad statement contained in the Thompson declaration was accurate."), *aff'd*, 907 F.2d 159 (Fed.Cir.1990). This is especially true since the United States and United Kingdom data were incompatible in certain instances.

Regarding an intent to deceive, the key problem for Glaxo is that nearly half of the data on the comparative studies between ethanol enhanced formulations and non-ethanol formulations was not submitted to the PTO. The appearance of improper behavior by Glaxo in prosecuting the patent, therefore, appears great. Notwithstanding this fact, I find that Glaxo's conduct in its totality does not "manifest a sufficiently culpable state of mind" to conclude that Dr. Hempenstall had an intent to deceive the PTO. *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d at 809. It has not been demonstrated by clear and convincing evidence that Dr. Hempenstall or any other Glaxo representative intentionally withheld or misrepresented information to deceive the PTO into issuing the '249 patent. Although I am troubled by Glaxo's failure to present all of the statistical data to the PTO, Dr. Hempenstall offered plausible explanations for limiting the data in his declaration. Moreover, Dr. Carstensen's testimony tends to lend credence to Dr. Hempenstall's decision.

Dr. Hempenstall testified that when he initially received the statistical analyses, he believed that the United Kingdom data only marginally supported the claim of the patent. (Hempenstall Tr. at 4248.) He said that he studied the report for approximately one month prior to reaching the conclusion that the data supported the enhancing effect of ethanol. He further testified that his decision to exclude the United Kingdom data was based on his determination that that data was unreliable. The United Kingdom data contained an outlier sample, SP88/026, a formulation with ethanol at 45C̄.[33] Dr. Hempenstall concluded that the sample was an outlier because the rate constant figure for SP88/026 was substantially off scale in comparison to the other samples with ethanol at that temperature. The fact that it was an outlier, he said, was confirmed by the fact that the statistician was unable to pool/combine the 45C̄ data. (Hempenstall Tr. at 4250–51;DX–34, Table 1.2.) Dr. Hempenstall also noted

---

**33.** During patent prosecution of the application for the '249 patent, the USP's definition of room temperature was not one definitive degree of temperature. Room temperature was between 15C̄ and 30C̄. Dr. Carstensen testified that the definition would have been changed in the 1995 edition of the USP to 20–25C̄. (Carstensen Tr. at 2636.)

that there was no statistically significant difference between the ethanol and non-ethanol programs from the United Kingdom studies.

Dr. Hempenstall's decision not to include the 20C̄ data for both ethanol and non-ethanol formulations from the United States studies stemmed from his conclusion that the amount of the degradation of the drug product over the three year period of the study was so insignificant, amounting only to approximately 3%, that it precluded him from drawing any reliable conclusions about the formulations. Dr. Hempenstall explained that in order to make comparisons of the formulations it was necessary that the samples showed a greater amount of degradation of the drug product. At the higher temperatures, degradation of the drug product was occurring at a greater rate, on the order of four times more. Dr. Hempenstall was firm in his testimony that the validity of data comparing the stability of formulations is greater where there is a greater amount of degradation occurring, (Hempenstall Tr. at 4250–51), and Pharmadyne offered no evidence to the contrary.

Although Dr. Carstensen questioned Dr. Hempenstall's motives in not including all of the comparative data, he essentially confirmed Dr. Hempenstall's conclusions regarding the excluded information. Dr. Carstensen confirmed that $SP^{88}_{026}$ is an outlier, is not reliable data, and should not be used. (Carstensen Tr. at 3834–35; 2619–20.) Dr. Carstensen testified that the data from sample SP88/026 indicated that something may have been wrong with the United Kingdom formulation. (Carstensen Tr. at 3849–50.) Dr. Carstensen acknowledged that the United Kingdom formulation could have been contaminated. (Carstensen Tr. at 3850.)

Pharmadyne challenged Dr. Hempenstall's inclusion of the 37C̄ data in his declaration on the basis that it was above room temperature and had not been verified by the Statistics Division. There is no clear evidence in the record evidencing any improper conduct on the part of Dr. Hempenstall in including the 37C̄ data in his declaration. On cross-examination, Pharmadyne raised the issue of whether the statistician had actually analyzed the data for that particular study and wheth-

er the figures Dr. Hempenstall submitted in his declaration were correct. Dr. Gillian Amphlett of Glaxo's Statistics Divisions expressed uncertainty at her deposition whether the 37C̄ figures had been analyzed and forwarded to Dr. Hempenstall. (Hempenstall Tr. at 4331–34.) She could not recall performing such an analysis. Dr. Hempenstall recalled otherwise.

In light of the fact that Dr. Carstensen conceded that he never reviewed the raw data from any of the comparative studies used by Glaxo to support its patent claim, and in light of Pharmadyne's failure to actually establish that the data provided to the PTO was false or inaccurate, I am persuaded that Dr. Hempenstall's recollection is reliable. There is no evidence that Dr. Hempenstall acted for any reason other than the reasons he stated. Pharmadyne essentially has asked the Court to find the requisite intent and materiality for inequitable conduct by Dr. Hempenstall in the exclusion of certain data from his declaration. Dr. Hempenstall excluded both favorable and unfavorable data and presented bona fide reasons for his decision to include and exclude data. Accordingly, I do not find inequitable conduct by Dr. Hempenstall.

## V. CONCLUSION

For the reasons set forth above, a judgment order shall be entered herewith in favor of Glaxo.

## SECOND AMENDED JUDGMENT ORDER

In accordance with the FINDINGS OF FACT AND CONCLUSIONS OF LAW entered in this matter on September 30, 1998, it is this 2nd day of November, 1998, by the United States District Court for the District of Maryland, ORDERED, ADJUDGED, DECREED and DECLARED:

(1) The plaintiffs' motion for summary judgment is GRANTED, and all claims related to the '431 patent are DISMISSED WITHOUT PREJUDICE FOR LACK OF SUBJECT MATTER JURISDICTION; and it is further ORDERED

(2) JUDGMENT IS ENTERED IN FAVOR OF PLAINTIFFS AS TO ALL OTH-

ER ISSUES, TO WIT: U.S.PATENT NOS. 4,585,790 and 5,068,249 ARE NOT INVALID, ARE ENFORCEABLE AND ARE INFRINGED BY DEFENDANTS' ANDA No. 74–794; and it is further ORDERED.

(3) Defendants, Pharmadyne Corporation, Andapharma Corporation, UDL Laboratories Inc. and UDL Laboratories, Inc. (Largo, Florida), and their respective officers, agents, servants employees, and attorneys are PERMANENTLY ENJOINED, RESTRAINED, and PROHIBITED:

 (i) from infringing claims 1–5, 9–11 and 13 of U.S.Patent No. 4,585,790 and claims 1 and 4–10 of U.S.Patent No. 5,068, 249, including, without limitation, by making, using, selling, offering to sell and/or importing into the United States, Ranitidine Oral Solution, USP covered by ANDA No. 74–794; and

 (ii) from seeking an effective date of FDA approval to market or sell Ranitidine Oral Solution, USP covered by ANDA No. 74–794, prior to the expiration of U.S.Patent Nos. 5,068, 249 and 4,585, 790, and it is further ORDERED

(3) The CLERK shall CLOSE THIS CASE and PROVIDE copies of this Second Amended Judgment Order to all counsel appearing in this action.